## ESKRIDGE *vs.* THE STATE.

1. The statutory offence of mayhem (Code, § 3105) may be committed on a slave.
2. The fact that the defendant was intoxicated—"that he was excited and scattering in his conversation, and that no one who heard him could repeat all that he said," does not render his declarations or confessions of guilt inadmissible.
3. The party who insists on error must make the record affirmatively show it.
4. When the indictment alleges that the slave who was maimed belonged to the defendant's wife, while the evidence shows that the defendant himself was the owner, the variance is fatal; the allegation of ownership, being a material part of the description of the slave, must be proved as laid, in order to identify the person on whom the offence was committed, thus enabling the defendant to prepare his defence, and making the record of his conviction or acquittal a protection against a second indictment for the same offence.
5. Although the master may use such means, and so much force, to any extent, as will be effectual to subdue his slave, yet he may not deprive the slave of life or limb, unless impelled to such an act by necessity.
6. The prisoner being indicted for mayhem of a slave, the evidence showed that he shot the slave in the leg, rendering its amputation necessary, and "that the shot seemed to go together, making a continuous wound:" the court charged the jury, " that, as there was no proof of the distance between the prisoner and the slave when the wound was inflicted, *they might look to the character of the wound, for the purpose of determining whether he fired the gun with the view of striking and disabling the leg*": *Held*, that the charge was not erroneous.

APPEAL from the Circuit Court of Sumter.

Tried before the Hon. ALEX. B. CLITHERALL.

RICHARD M. ESKRIDGE, the appellant, was indicted at the Spring term, 1854, of the Circuit Court of Sumter, for disabling a leg of a slave named Maria, alleged to be "the property of Mrs. Eskridge," by shooting her in the leg with a shot gun, and was convicted. The principal evidence against him consisted of his own confessions, as testified to by the physicians who amputated the limb of the slave. No question was raised in the court below as to the admissibility of the evidence; the only questions reserved by the bill of exceptions relate to the charges of the court, which will be readily understood from the opinion. There was no demurrer, and no motion in arrest of judgment.

A. A. COLEMAN, for the appellant:

1. There is no such offence known to the statute law of this State as mayhem of a slave. The Code (§ 3105) applies only to the crime when committed on a white man. This view does not conflict with the provision in the sixth article of the State constitution, which merely directs what the punishment shall be. The Legislature has wholly failed to enact a law upon the subject. A negro, in this State, is nothing more than a chattel, except in those cases in which, by express legislation, he is recognized as a human being, by making him amenable for his crimes, and protecting him against abuses.

2. If the mayhem of a slave is recognized at all, it must be by reference to the common law; and by the common law, it is at most a misdemeanor. The punishment, therefore, should have been as directed in section 3301 of the Code.

3. The offence being, at most, recognized only by the common law, the indictment should have conformed to all the requirements of a common-law indictment. The indictment, however, is not good as a common-law indictment, and is a mere blank sheet of paper, unless made effective by the Code (§ 3503), which is denied.

4. The defendant's confessions should have been entirely discarded by the court, because the witness was unable to recollect and state the whole conversation.—Starkie and

Phillips on Evidence, title " Confession"; also Wharton's Crim. Law.

5. The defendant's confessions should have been excluded, also, because of his drunken condition at the time they were made. They were not freely and voluntarily made, and were entitled to no more consideration from the court than the ravings of a madman.

6. The ownership of the slave is an essential allegation of the indictment, and it must be proved as laid.—State v. John, 2 Ala. 130 ; State v. Flora, 4 Porter — ; State v. Phereby, 16 Ala. 174 ; State v. Winter & Scisson, 20 Ala. 39 ; 2 Virg. Cas. 394 ; 11 U. S. Digest, § 385.

7. Allegations which are descriptive of the identity of that which is legally essential to the charge of the indictment, are not surplusage, but must be proved as laid.—2 U. S. Digest, p. 149, §§ 105, 106, 107, 108 ; Noble v. The State, 15 Maine R. 476 ; United States v. Brown, 3 McLean's R. 255 ; Hooker v. The State, Ohio Con. R. 819 ; Archb. Crim. Pl. 30, 108 ; 1 Greenl. Ev. §§ 65, 67 ; 2 Russ. on Crimes, p. 705 ; 1 Phil. Ev. 506, 530 ; 3 Stark. Ev. 1531.

8. The second charge was calculated to mislead the jury. There cannot exist an " absolute necessity" to do such an act. Although the defendant had the right to maim or kill his slave, in order to reduce him to subjection, when in active and open rebellion against his authority, still he might have avoided the act by fleeing, and therefore the necessity could not be absolute. The jury may have been led into the error of supposing that it was the master's duty to flee from his slave. As to the master's dominion over the slave, see Dave v. The State, 22 Ala. 23.

A. MARTIN, for the Attorney General, contra:

1. The averment in the indictment of the ownership of the slave was unnecessary and immaterial ; and therefore it was unnecessary to prove it as laid.—United States v. Howard, 3 Sumner's R. 15, 18 ; Commonwealth v. Cooley, 10 Pick. 37; The State v. Scott, 1 Hawks (N. C.) 24 ; Commonwealth v. Arnold, 4 Pick. 252 ; Stark. Ev. 1533.

2. There was no error in the charges of the court.—Dave v. The State, 22 Ala. 23.

CHILTON, C. J.—1. We were at first inclined to doubt whether the statute defining the crime of mayhem (Code, § 3105) extended to the disabling of slaves, as ordinarily they are not to be considered as embraced in statutes unless specially named; but upon an examination of the constitutional provision relating to the subject, we feel satisfied that they are included. That declares, that "Any person who shall maliciously dismember or deprive a slave of life, shall suffer such punishment as would be inflicted in case the like offence had been committed on a free white person, and on the like proof, except in case of insurrection of such slave."—Art. vi., title Slaves, § 3. It is clear, we think, from this provision in the constitution, that both slaves and freemen are placed upon the same footing, as respects the maliciously depriving them of life, or dismembering them; and that this provision in the statute is in accordance with, and designed to carry out, that clause in the constitution.

No point is presented by the bill of exceptions, respecting the declarations or admissions of the defendant, made to Doctors Colgin and Hadden. No objection was made in the court below to the admission of the testimony, and no sufficient reason appears why it should have been excluded. It is said, the defendant was much intoxicated when he made the declarations as to his having shot the slave, that he was excited, and scattering in his conversation, and that no one who heard him could have repeated all he said. These declarations were deposed to by physicians; they could doubtless have formed a very correct idea as to whether the defendant's mental condition was such that he knew what he was saying. It does not follow necessarily, that because the party was much intoxicated his reason was so far dethroned as to disable him from comprehending the effect of his admissions, or from giving a true account of the occurrence to which they had reference. Neither does it follow, because the witnesses were unable to detail everything the accused said to them while they were amputating the wounded limb of the slave, that they failed to give his entire declarations as to his agency in inflicting the wound. We are not allowed to presume that the court below permitted garbled statements to be given in evidence to the jury, or that it allowed the confessions of a

madman or maniac, made so by intoxication, to be received as evidence of the prisoner's guilt. On the contrary, we must intend, that the court was influenced to admit the declarations by evidence sufficient to satisfy it of the capacity of the prisoner to make confessions which could be relied upon as evidence, at least in some degree, and that, although the witnesses did not and could not depose to all the prisoner said, yet what they did depose to was a fair and full statement of all he said upon the subject of his having committed the offence, and that his statements were not garbled and tortured by the witnesses, omitting parts of the conversation tending to qualify the portions deposed to, and to exculpate the prisoner.

If any circumstance had existed, tending to render the evidence of the prisoner's declarations inadmissible, it would doubtless have been set out in the bill of exceptions. As it is, we cannot say the proof was illegal, as we can indulge no presumption adverse to the regularity of the judgment of the court below. The rule requires the party who insists that the court committed an error, to make the record affirmatively show it.

As to the charge of the court, which asserts that the ownership of the slave, although averred in the indictment to be in Mrs. Eskridge, may be proved to be in the prisoner, and that the variance would be immaterial, we think the court committed an error. It is true, there are some cases which seem to countenance the doctrine asserted by the charge. They will be found cited by the counsel representing the State. But recurring to elementary principles and long recognized precedents, from which it is always unsafe to depart, we feel constrained to hold that the averment of ownership of the slave is a part of the description of the person on whom the offence was committed; and without now intending to decide what would be our opinion, if the proof had stopped short of proving ownership at all, yet, being proved in another, we think the variance is fatal. "Slave Maria, the property of Mrs. Eskridge," is not the Maria who belongs to the prisoner; and if the averment of ownership is immaterial, considered as a part of the description, and it may suffice if any person other than the owner stated in the indictment is the pro-

prietor, why may we not disregard the word slave, which is also descriptive ? Indeed, it would be difficult to fix upon a point where we might with any safety stop. The person on whom the injury was inflicted must be described so as to be identified, that the prisoner may be prepared to make his defence, and so that the record of his conviction or acquittal would furnish him a protection, should he be again indicted for the same offence.

"It is," says an eminent writer upon the subject of evidence, " a most general rule, that no allegation, which is *descriptive* of the *identity* of that which is legally essential to the claim or charge, can ever be rejected."—3 Stark. Ev. 1529. In such case the variance will be fatal, inasmuch as it destroys the legal identity of the claim or charge alleged with that which is proved.—*Ib.* 1531-2. In describing slaves, who generally have but one name, and never a surname, the statement of the name of the owner is a very proper allegation descriptive of the slave. The fact of ownership, *as such*, is immaterial in cases of this character , but, when averred as a *matter of description of the slave*, and it is proved that the slave on whom the injury has been committed is the slave of another, and not of the person charged in the indictment, the identity is destroyed ; and the prisoner, if convicted of mayhem upon the indictment charging him with dismembering a slave of Mrs. Eskridge, could not interpose this conviction in bar of another indictment for mayhem upon his own slave, any more than if indicted for stealing a black horse he could be convicted for stealing a white one.

The true rule, in our opinion, is, that no allegation in an indictment, whether it be necessary or unnecessary, whether it be more or less particular, which is *descriptive* of the *identity* of that which is legally essential to the charge, can ever be. properly rejected as surplusage. That there may not be cases, where the proof falls short of establishing a variance, in which immaterial descriptive averments may be disregarded, the offence having been established without their being proved, we do not deny ; but where it is affirmatively shown that a descriptive allegation is untrue, and a variance is thus established, especially as to the person on whom the offence is charged to have been committed, the identity of the offence

charged with that proved ceases; and it is against common right to indict a man for an offence upon one person and find him guilty of an offence against another. He has not been indicted for the latter offence, and cannot, therefore, be properly convicted of it.

Mr. Roscoe, in his work on Criminal Evidence, page 106-7, says: "Not only must the names descriptive of the prosecutor, or party sustaining the injury, be strictly proved, but, where the name of a third person is introduced into the indictment, *as descriptive of some person or thing*, that name also must be proved as laid." An example given by him of an adjudged case is in point, to show the correctness of the position we here advance: "On an indictment under the black act, for maliciously shooting A. Landon, in the dwelling-house of *James* Brewer and *John* Landy, it appearing in the evidence that it was in the dwelling-house of John Brewer and James Landy, the court said, that as the prosecutor had thought proper to state the names of the owners of the house where the fact was charged to have been committed, it was a fatal variance.—Durore's Case, 1 Leach 352; 1 East Pl. Cr. 45; Queen v. Soley, 2 Salk. 595; State v. Martin, 3 Murph. 533. So also, where a party was indicted for feloniously marrying Elizabeth Chant, *widow* (his former wife being alive), and the proof showed that said Elizabeth was a single woman, *held* by all the judges that the variance was fatal, although it was not necessary to have stated more than her name.—1 Moody's C. C. 303.

We are unable to perceive any error, against the prisoner, in the second charge, which asserts the proposition, "that if the slave was in rebellion against the master, he was authorized to employ sufficient force to reduce her to subjection, and if she could not be so reduced to subjection, except by shooting her, he might do this; but that a resort to such force would not be permitted, unless it was absolutely necessary to reduce her to subjection." The charge must be construed with reference to the proof in the cause. From this it appears, that when the master attempted to chastise the slave, she seized an axe and told him not to come near her, else she would kill him; that on his nearer approach, the slave moved threateningly toward him with the axe; that the master then

retreated to the house, got his gun, with which his boys had been in the habit of shooting birds with small shot, but which, without his knowledge, had been loaded the day previous with buck shot; that upon coming out of the house, with his gun, the slave moved off sidewise, with the axe in her hand half raised; that defendant (the master) called to her to stop, which she refused to do, and thereupon he shot her, inflicting the wound. Now, although the owner may employ such means, and so much force, to any extent, as will be effectual to subdue his slave, as we decided in Dave v. The State, 22 Ala. 23, yet he may not deprive the slave of life or limb, without being impelled to such an act by necessity. Whether this charge is not too favorable to the prisoner, when considered with reference to the testimony, it appearing that the slave was retreating from him; whether the master, in any case where it is not required for his self-protection and defence, or justified or excused upon some principle of law as applicable to free persons, would have the right thus to shoot off the limb of his slave; whether, in short, except in case of insurrection of such slave, the constitution of this State, which declares that " any person who shall maliciously dismember or deprive a slave of life, shall suffer such punishment as would be inflicted in case the like offence had been committed on a free white person, *and on the like proof*, except in case of insurrection of such slave," does not guaranty to the slave the same protection as respects maliciously killing or dismembering him, as is extended to free white persons,—are questions which we are not now called upon to decide; for, if the charge which justified the master in shooting the slave in the leg, if this were absolutely necessary *to reduce her to subjection*, and not as a means of overcoming her forcible resistance, is opposed to the above provision of the constitution, it is an error of which the prisoner has had the advantage, and consequently one of which he cannot complain. We are satisfied that it contains no error adverse to him.

The only remaining question grows out of the third charge given to the jury, which was, " that, as there was no proof as to the distance the prisoner was from the slave when the wound was inflicted, the jury might look to the character of the wound, for the purpose of determining whether he fired

the gun with the view of striking and disabling the leg." It will be borne in mind, that the gun was loaded with shot, and they seemed to "go together," as the witnesses stated it, making "a continuous wound." This was a circumstance of which the jury might very properly consider, as indicating that the prisoner was near to the slave when he fired ; for experience teaches that shot discharged from a shot gun at any considerable distance will scatter. Being so near that the shot made but one orifice, it was a question whether, at this short distance, the prisoner would be likely to miss his aim ; in other words, whether he did not aim at the leg of the slave which the shot struck. Nothing is more common, in cases of homicide and wounding, than to look at the character of the wound, to aid in attaining to a correct conclusion as to the manner in which it was inflicted. We think this charge was unobjectionable.

For the error in the third charge, as to the variance, the judgment of the Circuit Court must be reversed, and the cause remanded. The usual order will be made for remanding the prisoner from the penitentiary to the jail of Sumter county, where he will remain in custody, to await his trial upon a new indictment, should the State prefer one at the next term, or until otherwise discharged by due course of law.