321 So.2d 698

**Howard PATTERSON**

v.

**STATE.**

**7 Div. 383.**

Court of Criminal Appeals of Alabama.

Nov. 4, 1975.

Patrick H. Tate and Winfred M. Watson, Fort Payne, for appellant.

**360**

William J. Baxley, Atty. Gen., and Sarah M. Greenhaw, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was indicted for murder in the first degree. At arraignment, attended by counsel, he pleaded not guilty. The jury rendered a verdict of murder in the second degree and fixed his punishment at ten years in the penitentiary. Notice of appeal was given in open court. Appellant was found to be indigent and he was furnished a free transcript. Trial counsel was appointed to represent him on appeal.

State Trooper Thomas Gregory Cole was the first witness called by the state. He testified his home station was Piedmont, Calhoun County, Alabama, but he worked a three-county area including Cherokee County; that on Sunday morning, April 14, 1974, he received a radio dispatch concerning an accident at the Turkey Foot Service Station in Cherokee County. He entered the station and found the deceased sitting in a chair. He observed two bullet wounds in the upper chest and the man was dead. The deceased had his right hand hanging over one arm of the chair and on the floor directly under this hand was a smoking pipe. He found a .9 mm automatic pistol on the counter near the chair in which the deceased was sitting. He further stated that this pistol had been recently fired. He smelled the odor of alcohol on the deceased.

The trooper found appellant in an automobile that had run off the edge of a roadway near the edge of a lake on Highway 278 near the Georgia State line. He stated that appellant was in the front seat lying down or had slumped over in the seat. He further testified that appellant was drunk or highly intoxicated, but started coming to himself a short time later. He handcuffed him and moved him from the car. Someone assisted him in carrying appellant up the bank from the lake. He searched him and found a .25 caliber pistol in appellant's back pocket. He turned this pistol over to Sheriff Garrett who came to the scene between 7:30 and 8:00 a.m., probably thirty minutes after the trooper got there.

On cross-examination this witness stated that in his opinion appellant was intoxicated but he didn't run any tests on him and did not get a blood alcohol analysis.

Photographs were taken at the scene of the shooting and photographs of the body of the deceased were made. All were introduced in evidence without objections.

Sheriff Mac Garrett testified that he went to the scene of the shooting on the morning of April 14, 1974. He stated that he found the body of the late Osto Fletcher sitting in a chair in a slumped position

and that he was present when photographs were made of the interior of the service station. He said he found a .9 mm pistol near the cash register and that it appeared to have been fired recently. He also found two spent cartridges at the scene and he turned the pistol and spent cartridges over to Mr. Van Pruitt, a State Toxicologist. The Sheriff further testified that Fletcher was dead when he first saw him and that he appeared to have two holes in him in the area of the chest. He stated that he searched Fletcher's body for weapons and did not find any and that he did not see any weapons near the body.

The Sheriff further testified that he arrested appellant between 7:30 and 8:30 a. m. and that he appeared to have been drinking. He stated that he did not formally place him under arrest until he got him to the county jail. He said he started to talk to appellant around 9:00 that morning relative to the death of Fletcher and that neither he nor anyone else made any threats toward appellant or offered him any promises of reward or immunity to get him to make a statement.

At this point a voir dire examination was conducted out of the presence and hearing of the jury. At this hearing the Sheriff testified that he first saw appellant between 7:30 and 8:00 o'clock and that when he questioned him at 9:00 o'clock he had sobered up considerably.

From the record:

"Q. Sheriff, from the time you first saw the defendant, Mr. Patterson, between 7:30 and 8 o'clock and 9 o'clock when you questioned him, had he sobered up considerably?

"A. Yes, he was soberer than he was when I first saw him.

"Q. At that time did you explain to him his rights?

"A. Yes.

"Q. Did you read the card to him?

"A. Yes.

"Q. Do you have the card with you?

"A. Yes sir.

"Q. Will you read the card to the Court as you read it to him on this occasion?

"A. 'You have the right to remain silent. Anything you say can be and will be used against you in a Court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer one will be appointed to represent you before any questions if you wish one.'

"Q. I'll ask you if after you read that to him he told you he understood it?

"A. Yes sir.

"Q. Did he tell you he'd make a statement about the death of the late Mr. Fletcher?

"A. Yes sir.

"Q. What did he say?

"A. He said, 'I just wanted to kill somebody.' He didn't know why he did it.

"Q. Did he tell you that he shot him?

"A. Yes.

"Q. He didn't know why he did it, just wanted to kill somebody?

"A. Yes.

"Q. Did you ask him at that time if the dead man had any weapon or threatened him in any way?

"A. I don't believe I did.

"Q. His statement was that he killed him and he didn't know why he did, he just wanted to kill somebody?

"A. Yes.

MR. BLACK: Your witness.

CROSS-EXAMINED BY MR. TATE:

"Q. Sheriff, did you make the statement that you did not ask Mr. Patterson if the other man had a weapon?

"A. I could have. I don't remember if I did.

"Q. You don't remember if you asked him that question or not?

"A. Yes sir.

"Q. I believe you said he had been drinking and now you say he had sobered up considerably. How much had he been drinking?

"A. I couldn't say. He was pretty drunk when we first got up there.

"Q. But you said he had sobered up considerably.

"A. Yes, he had sobered up considerably.

"Q. How long had it been from the time you arrested him until you talked to him?

"A. Oh, an hour, an hour and a half, an hour and fifteen or twenty minutes, over an hour.

"Q. Was he pretty drunk at the time you arrested him but he wasn't that drunk at the time you questioned him?

"A. No sir.

"Q. How long does it normally take somebody to sober up when they've been intoxicated?

"A. It's according on how much they drink. Sometimes it takes a good while.

"Q. Isn't the maximum anybody can sober up .025 per hour per alcohol content?

"A. I wouldn't say about that.

"Q. You don't know about that?

"A. No sir.

"Q. Who was present when you questioned him?

"A. I believe one of the deputies and the jailer was present before we locked him up.

"Q. You questioned him before you locked him up?

"A. Yes sir.

"Q. You advised him of his rights?

"A. Yes sir, did that to start with.

"Q. He didn't have any of his kinsmen or anybody else there when you talked to him, did he?

"A. No sir.

"Q. He hadn't had a chance to confer with a lawyer, had he?

"A. No sir, he said he didn't want one.

"Q. You said he sobered up some, was he still intoxicated when you talked to him?

"A. I wouldn't say he was drunk.

"Q. Was he under the influence?

"A. Some, yes."

In addition to the above testimony the court asked the Sheriff the following questions and received the following answers:

"COURT: Sheriff, did you carry on any conversation with the defendant immediately prior to reading him his rights?

"A. Yes sir.

"COURT: Was he able to converse with you and engage in conversation with you?

"A. Yes sir, he even talked all the way from over there to over here.

"COURT: Was what he was saying understandable?

"A. Yes sir, very.

"COURT: Was he slurring his speech in any way at that time?

"A. Not too much that I could tell.

"COURT: Did he respond to your instructions when you would tell him to do something?

"A. Yes sir.

"COURT: Did he appear to understand what you were saying to him?

"A. I think he did, yes sir."

At this voir dire hearing appellant took the witness stand and testified that he heard the Sheriff's testimony about his confession concerning the shooting of Osto Fletcher and was asked if he recalled any of it at all, to which he replied, "No, sir." He stated that he did not recall talking to the Sheriff or any of his deputies and the first thing he remembered on that morning was after he was put in jail. Appellant further testified that he remembered shooting Fletcher but the last thing he remembered was when hs car ran off the roadway and that he woke in the bullpen area in the county jail at which time he believed it was around 10:00 a.m.

On cross-examination appellant testified that he had taken two drinks out of a half pint of whiskey that he and Fletcher had gotten around 11:00 p.m. on the night of April 13, 1974. He stated he was not drunk but only had two drinks and that he was injured when he ran off the highway and that his head struck something inside the car. He admitted that he did not tell the Sheriff that he had injured himself. He continued to testify that he was not drunk and that he had only taken two drinks but did not recall talking to Sheriff Garrett or making any statement to him.

The Sheriff was recalled and testified that appellant told him who he was, told him his birthdate, stated his weight and height, and gave him the name of the man he had killed and did all of this in an intelligent manner.

At this point appellant's counsel objected to the admission of the confession made to the Sheriff on grounds to the effect that the testimony adduced by the state showed that appellant was still intoxicated at the time he made the confession and that his state of mind was such that he could not remember anything from the time of the shooting and the car wreck, and he could not make an intelligent waiver of his constitutional rights.

From the record:

"COURT: Gentlemen, before the Court rules on that objection, I want to ask the Sheriff a question or two. Sheriff, did the defendant make any complaint to you about having received an injury the night before, or was he complaining of any injury when he was arrested or placed in custody?

"A. No sir.

"COURT: Did you observe any apparent injury to him at that time?

"A. No sir. It wasn't noticeable if there was.

"COURT: Did you ask him these questions or advise him of his rights prior to placing him in jail?

"A. No sir, he was inside the jail. We hadn't locked him up, but he was in the jail.

"COURT: He was not yet in the cell?

"A. No sir.

"COURT: Approximately how much time had elapsed from the time that you first arrived at the scene around 8 o'clock and the time that you advised him of his rights?

"A. It was an hour, an hour and fifteen minutes, something like that.

"COURT: Gentlemen, I'm going to overrule the objection and allow the statement to be admitted."

The jury returned to the courtroom and the trial continued. The Sheriff gave the same testimony before the jury concerning appellant's confession, all after the proper predicate was laid.

He further testified that when he read appellant his rights from a *Miranda* card, he thought he was still under the influence of alcohol but that he had no difficulty in speaking, walking, and understanding what he said. That appellant told him he knew his rights and did not want a lawyer. He said he would make a statement and told the Sheriff that, "he just wanted to kill somebody," and, "he didn't know why he did it."

The Sheriff further testified he found two spent slugs in the station on the morning of April 14, 1974. One was found in some bottle crates and the other was in the door facing. He found a claw hammer in a drawer in the back of the station and took the door facing off to get this slug. He denied that there was a hammer or other weapon near the chair in which the deceased was sitting when he was shot. He said he delivered the two spent cartridges and the .25 caliber pistol to Mr. Van Pruitt at the laboratory of the Toxicology Department in Huntsville.

Mr. Van Pruitt testified that he was the Regional Laboratory Director of the Huntsville Division for the State of Alabama, Department of Toxicology and Criminal Investigation, and had been so employed since 1964. Counsel for appellant admitted that Mr. Pruitt was a qualified toxicologist and criminologist and was an expert in his field.

Pruitt performed an autopsy and described his findings as follows:

"I determined that the upper wound in the left chest entered the left chest cavity through the fifth innerspace which would be the musculature between the fifth and sixth ribs. From that point it passed through the apex of the heart which would be the tip or the lower cone of the heart and exited the left back at the level of the tenth rib. The lower wounds in the left chest entered the chest cavity passing through the lower lobe of the left lung and across the diaphragm muscle which is the muscle across the lower portion of the chest that separates the so-called chest from the abdomen. And from that point passed across the top surface of the liver and exited the body on the right side at the level of the eighth rib."

Mr. Pruitt expressed his opinion as to the cause of death in these words:

"Gunshot wounds as I have described primarily producing injury to the heart, lung and liver."

He further testified that he made a blood analysis of alcohol of the deceased and determined that he had a 0.34 percent level of alcohol and this showed that he was intoxicated at the time of his death.

Mr. Pruitt further testified that he received two spent slugs and a .25 caliber pistol from Sheriff Garrett and he test-fired the pistol to make a comparison with the known bullets found in the service station. He stated that the two slugs were fired from the .25 caliber pistol.

At the conclusion of the state's case appellant made a motion to exclude the state's evidence on the ground that the state failed to prove a prima facie case. This motion was overruled and denied.

Appellant, appellant's son, and two character witnesses testified in his behalf. According to appellant's testimony he lived in Cedartown, Georgia. He stated that his son ran a service station in Cherokee County, Alabama, known as Turkey Foot Lake Gas Station. That his son employed him to work three days each week and serve as night watchman. That he was working on Saturday night, April 13, 1974, and that his son was there until about 11:00 p. m. That the deceased, whom he did not know, and some other people came to the station to fish in a nearby lake and they arrived around 5:00 p. m. He observed them drinking beer and dancing to

the music made by a record player. He identified these people as the deceased, Bill Stewart, Stewart's wife and two children.

He further testified that some time after midnight the deceased came to him and asked him to take him to a package shop over the Georgia State line to get some more beer, the package shop being some two and a half miles away. He agreed to carry the deceased provided Stewart would look after the station. Appellant stated they were gone about fifteen minutes and when they returned, he found the door to the station had been kicked open and the Stewarts were gone. He further stated that the package shop was closed and they could not buy any beer, but that the deceased bought two half pints of bootleg whiskey. The deceased opened a bottle of whiskey and gave appellant a drink. Appellant offered the deceased a blanket so that he could sleep in appellant's car until the next morning but the deceased remained in the station and kept sitting around and drinking from his bottle of whiskey. Appellant went to the back of the station to check the merchandise and as he came back toward the front he saw the deceased coming at him with a hammer in a drawn position. That when he saw the deceased approaching him with a hammer, he fired the first shot and a few moments later he fired the second shot and the deceased fell backwards into the chair. He stated that the shots were fired six to eight feet from the deceased.

On cross-examination appellant said that after firing the shots he went out to the highway to try and stop traffic to go for help. When he did not see any traffic, he decided to drive into Georgia toward Cedartown to use a telephone to call for help. He denied making the statement to the Sheriff about wanting to kill someone. He further stated that he had only two drinks of whiskey that night. Appellant continued to testify that he did not remember being arrested by Trooper Cole or Sheriff Garrett and did not recall talking to the

Sheriff either at the lake or on the way to the jail. He said he did not recall the Sheriff advising him of his rights and did not recall the conversation in which the alleged confession took place.

Appellant's son testified that he ran the station known as the Turkey Foot Lake Gas Station in Cherokee County, Alabama, and that he employed his father on a part-time basis as a night employee to guard the station and wait on customers. That he owned a .9 mm pistol and a .25 caliber automatic pistol and that he gave these pistols to his father for his self protection. He further testified that he saw the deceased between 5:00 and 6:00 on the afternoon of April 13, 1974, and he was drinking beer at the time and appeared to be drunk at that time.

Appellant offered the testimony of two witnesses from Cedartown, Georgia, who testified to his good character and reputation in the community. They both testified that appellant's reputation for truth and veracity was good and that his reputation for non-violence was also good.

In rebuttal the state recalled the Sheriff who once again testified that the hammer he found at the gas station was found in the back of the gas station and was not found in the interior of the station near where the deceased was sitting in a chair when his body was found. To like effect was the testimony of Mr. Ken Phillips, an investigator for the District Attorney's Office, who went to the crime scene with the Sheriff and assisted him in removing the bullet from the door frame.

The only issue appellant raises on appeal concerns his alleged confession to Sheriff Garrett. He contends that the confession was not voluntary because he was intoxicated or otherwise incapacitated at the time.

The evidence tended to show that appellant was intoxicated at the time Trooper Cole arrived at the scene. The Sheriff

said when he first saw appellant, he appeared to have been drinking, but when he questioned him later, he had sobered up considerably. The Sheriff further stated that appellant was not drunk at the time he talked to him but he was to some degree still under the influence, yet he answered all questions in an intelligent manner.

 In *Anderson v. State,* 45 Ala. App. 653, 235 So.2d 902, appellant contended that his alleged confession was inadmissible because he was intoxicated at the time it was alleged to have been made, thus rendering anything he might have said involuntary.

In *Anderson* we said:

"Evidence was heard on the voluntariness of the alleged confession out of the presence of the jury in accordance with *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. There was ample evidence, even though conflicting, from which the trial judge could conclude that appellant was not intoxicated to the extent of mania. We conclude that the trial judge did not abuse his discretion in admitting the alleged confession for the jury's consideration. Intoxication which would affect the voluntariness of a confession is primarily a question of fact which first addresses itself to the trial judge to determine admissibility and later to be submitted to the jury for whatever consideration it may deem appropriate.

The rule is well established in this jurisdiction that intoxication short of mania or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words will not render a confession inadmissible. *Warren v. State,* 44 Ala.App. 221, 205 So.2d 916, cert. denied 281 Ala. 725, 205 So.2d 920; *Ray v. State,* 39 Ala.App. 257, 97 So.2d 594; *Smith v. State,* 25 Ala.App. 297, 145 So. 504; *Eskridge v. State,* 25 Ala. 30."

In *Carter v. State,* 53 Ala.App. 43, 297 So.2d 175, we held:

"Appellant contends that he was intoxicated at the time he made the confession and therefore the confession was involuntary and inadmissible. The law is clear that proof of intoxication amounting to *mania* or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words renders a confession so made by him inadmissible, but a lesser state of intoxication will not render the confession inadmissible. The voluntariness of an alleged confession is a question of law for the court and should be decided by the trial court upon preliminary proof, showing the circumstances surrounding the alleged confession, taken outside the hearing of the jury, and such finding will not be disturbed unless it appears contrary to the great weight of the evidence or is manifestly wrong. *Stewart v. State,* 49 Ala.App. 681, 275 So.2d 360."

To like effect are the holdings in the following cases: *Otinger v. State,* 53 Ala. App. 287, 299 So.2d 333; *Daniels v. State,* 53 Ala.App. 666, 303 So.2d 166; *Mergner v. United States,* 147 F.2d 572.

 The facts and circumstances attending the taking of the confession in this case were sufficient for the trial court to establish its voluntariness and to make the weight and credibility of the confession the province of the jury. *Jones v. State,* 292 Ala. 126, 290 So.2d 165.

The judgment of conviction is affirmed.

Affirmed.

All the Judges concur.