[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 324 
Richmond P. Rogers, Jr., was indicted by the Jefferson County Grand Jury for first degree murder in the shooting death of Hollis Lindley. Following a jury trial on October 14, 1976, Rogers was found guilty and sentenced to life imprisonment. *Page 325 
The evidence presented at trial established that about 1:00 A.M., on March 9, 1976, Rogers went to the bar area in the Back Door Lounge in Birmingham, presumably to talk to his wife. After discovering that his wife was not there, he ordered a drink and made a telephone call.
Rogers then went down a hall to the door of a back-room in the lounge where he thought his former wife, Nancy Morgan, was working. He asked to be admitted, and according to Rogers, was told by Hollis Lindley that he could not enter. Rogers said Lindley hit him in the stomach and threw him out of the lounge. When Rogers tried to re-enter the club a struggle between the two men ensued, during which time Lindley was shot and killed.
On the night in question, Patricia Nix, the bartender at the Back Door Lounge, testified that Lindley called to her from the foyer of the club and asked her; "Do you know this guy?" She replied: "No." She said that the man with Lindley in the foyer was Rogers and that he was bent over, making weird noises and saying that he wanted to come in and make a telephone call. Subsequently, Rogers attempted to enter the club and Lindley told her to call the police.
According to Nix, as she turned to leave, she heard a "smack" which sounded like someone being slapped in the face. She said she then heard someone say: "If you move or if you make another move, you're dead . . ." Further, she said that shortly afterwards, she heard a shot. Nix remembered that she hit the floor, crawled to the corner, and remained there until Cargile, a bar patron, crawled over to her. They then, together, left the lounge to hunt a policeman.
Richard Ayers testified that he along with Rogers, Lindley, a waitress, and several other customers, were at the Back Door Lounge at the time of the shooting. According to Ayers, as he sat at a table having a drink, Rogers got up, went through some swinging doors, and used the telephone. He was gone approximately ten minutes, returned to the bar and subsequently left the building.
After the appellant left, Lindley came in, gave some keys to the waitress and told her to lock up. Lindley then left but returned shortly thereafter and asked the waitress to "come here." She went over to where Lindley was standing near the back door. Ayers heard Lindley ask; "Do you know this guy?" and the waitress replied: "No." Lindley then told her to call the police. According to Ayers, Lindley and Rogers were arguing. Rogers insisted on using the telephone while Lindley kept telling him that he was trying to close up and that he would have to use the telephone outside.
Ayers testified that as he was going to the restroom, he saw Lindley restraining Rogers from coming inside. Ayers stated that while he was in the restroom he could not understand what was being said but did recall hearing a "lick passed and a scuffle."
Ayers said that, he heard a shot a few seconds after he left the bathroom. He said he thought at first it was a firecracker and as he continued to walk down the hallway he saw the appellant step in the doorway and walk toward him with a gun in his hand. According to Ayers, he told the appellant, "everything will be alright," and the appellant replied, "okay." Ayers said he walked on by Rogers and went into the lounge. Ayers testified that Hollis Lindley was lying face down in the doorway at the time.
Clark Cargile, another bar patron, testified that he was sitting at the bar when Hollis Lindley, the victim, asked the waitress; "Do you know this guy?" Cargile said that he assumed Lindley was referring to the appellant.
Cargile recalled, as Lindley was trying to close the outside door, the appellant made a request to use the telephone. Lindley told appellant that they were closing and that he could use the telephone outside. Cargile then heard a thud that sounded "like somebody falling or pushing against a wall." Cargile said he looked to his left and saw that one man had another by the shirt while the other had his right hand across the first man's waist. *Page 326 
According to Cargile, at that point, he heard one of the men say, "you m- f-, if you make one move you're dead." He saw a flash, from what he thought was the muzzle of a gun, and then heard an explosion. Cargile said that he "squatted down" behind the bar and subsequently crawled out the side entrance of the lounge with Pat Nix and a Mr. Garbart.
Officer R.M. Stidham of the Birmingham Police Department testified that on the morning of the shooting, at approximately 1:00 A.M., he was informed by a citizen that there had been a shooting at the Back Door Lounge. Stidham went to the lounge and as he entered the rear door of the lounge he stumbled across a body lying on the floor.
Stidham said he then returned to the outside so that his "walkie-talkie" could transmit and asked for additional policemen to proceed to the scene. In a few minutes, Sgt. Whisenhunt of the Birmingham Police Department arrived and Stidham informed him of what he had found. About that time, Stidham said they noticed a "subject on the other side of the East Lake Auto Sales," located just across the street from the building where the Back Door Lounge was housed. According to Stidham, the subject appeared to be darting into an alley that separated the parking lot from the auto sales lot. Stidham yelled at the man to halt which he did. The appellant was identified as the man whom he and Sgt. Whisenhunt apprehended the night of the shooting. Stidham stated that the appellant did not offer any resistance and that while he was being searched he said: "I killed him, didn't I?"
Whisenhunt testified that in response to Stidham's call he proceeded directly to the Back Door Lounge. On his arrival he saw Stidham come from the rear of the building. Stidham informed him that a man had apparently been fatally shot and was lying in the door of the lounge. Whisenhunt said that, as Stidham was informing him of what had occurred, they both saw a man behind a building across the street. According to Whisenhunt they called to the subject and within seconds they apprehended the man whom they later learned to be the appellant.
Whisenhunt stated that a search of the man revealed a pistol in a shoulder holster. Whisenhunt said the man was not asked any questions but as he took the gun from the holster the man said: "I shot him and I would shoot him again if he isn't dead, when a man messes with your kids he should be shot."
Whisenhunt said the man did not say anything further until they took him to the East Lake Precinct, about fifteen minutes later. Whisenhunt said the appellant was read his Miranda
warnings at that time. While Officer Stidham was filling out his report, the appellant said on his own volition that he had been following the victim around for a few weeks prior to the homicide, with plans to shoot him.
After having a few drinks at another lounge, the appellant went to the Back Door Lounge. He went to the club's back office where he thought the man he was looking for was located. The appellant went on in his statement and said that he pretended to be intoxicated and sick. He asked Lindley to help him. Rogers concluded his statement by saying that, when the victim came to assist him, he, Rogers, pulled a gun from his belt, placed it to the victim's head, and shot him.
Edward K. Alley, Jr., a police officer with the City of Birmingham, was involved in the investigation of the shooting at the Back Door Lounge. According to Alley, after completing his investigation at the Back Door Lounge, he and several other officers went to the East Lake Precinct where he saw the appellant, Richmond Preston Rogers. In Rogers' presence, Alley was asked by Officer Stidham what the victim's name was and told Stidham that the victim was Hollis Lindley. The appellant turned toward Officer Alley and asked: "Who?" The officer repeated the name of the victim, at which time the appellant said: "I don't know that man, I shot the wrong man." Alley said from that point on the appellant's whole demeanor changed. He seemed to be shocked and became quiet. *Page 327 
Several other police officers, including Whisenhunt, Alley, and Gaut, testified that the appellant, after having been transferred to the East Lake Precinct, made a series of statements of an inculpatory nature in their presence.
Officer J.A. Rose, an evidence technician with the Birmingham Police Department, testified that he took pictures at the scene of the shooting at the Back Door Lounge. He received two pistols, one from a holster on the victim's body and the other taken in the search of the defendant. Rose stated that the pistol taken from the defendant contained five live rounds and one spent one. He went on to say that he test fired the defendant's pistol and had given the test bullets to Sgt. David L. Higgins.
Sgt. David Higgins of the Birmingham Police Department assigned to the scientific investigation unit, testified that he made ballistic comparisons with the known bullets from the defendant's pistol and the bullet taken from the victim. It was his opinion that the bullets were fired from the same weapon.
Jefferson County Deputy Coroner, Jack R. Parker, testified that an autopsy was performed on the body of Hollis Lindley at which time a bullet was removed from the head area. He said there was a "penetration wound at the tip of the nose and there was no point of exit."
Jay Glass, the assistant pathologist at Cooper Green Hospital in Birmingham, Alabama, performed the autopsy on the body of Hollis Lindley. Glass stated that he found a gunshot wound at the tip of the nose and that this was "a contact or near contact wound." Further, he said he found gun powder tattooing or burns on the victim's face.
At the close of the State's evidence the defense made a motion to exclude, assigning as grounds, that the State had not proved the elements of premeditation and deliberation.
The motion was overruled and the defense called, as its witness, the appellant. He said that Lindley hit him in the stomach and threw him out of the lounge; that he tried to re-enter the lounge in order to talk with his wife, Nancy Morgan, who he thought was in a back room. The appellant said, as he attempted to push his way past Lindley, a struggle ensued. During the struggle Rogers discovered that Lindley was carrying a pistol in a holster.
According to Rogers, when Lindley shoved him through the inner door to the foyer, Lindley said to Rogers: "I ought to kill you boy," and slapped him in the face. Rogers said that, at that point, Lindley made a motion with his hand towards his pistol; that he, Rogers, attempted to hit Lindley; and at the same time, pulled his weapon and said to Lindley: "Don't go for it. If you do, I'm going to shoot you." He went on to say that Lindley moved toward his gun and that he, Rogers, shot him.
Several character witnesses were called and testified that Rogers had a good reputation in the community for truth and veracity. At the conclusion of this testimony, the trial ended.
 I
The appellant complains that his rights were prejudiced when the State was allowed a preferential setting for the trial in his case.
The case involving the appellant was set preferentially the week of October 11, 1976, in slot number 47. Following this preferential treatment, counselor for defendant made a motion to restore the case to the docket as it originally appeared, claiming that the setting worked a hardship on the defendant.
In support of his motion, the defense attorney stated that, on October the first, the assistant district attorney assigned to the case called him and said he was going to ask for a preferential setting.
The setting was requested due to an out of town witness. The record indicates that at the time the request was made it was believed that the out of town witness lived in Cleveland, Tennessee, when in truth, he lived in Cleveland, Alabama, which is located *Page 328 
approximately thirty miles outside of Birmingham. Further, after the assistant district attorney discovered his mistake, he still felt justified in his request, asserting that he did not know where Cleveland, Alabama was located.
Counsel for the defense stated that he informed the assistant district attorney that he would object to a preferential setting and requested that he have an opportunity to go with him to the docket control judge so that he could make known his objections to the setting. According to the defense attorney, he was at home, sick, when the district attorney first called him and informed him that a request for a preferential setting would be made. The next contact between the two adversaries was three days later when the district attorney called the defense attorney again and told him that such a setting had been obtained.
In the defense motion for a continuance it was alleged that the State would suffer no hardship in restoring the case to its original place lower in the docket. Counsel argued that the out of town witness worked for Delta Air Lines, within a few miles of the courtroom, and could easily be placed on call by the State.
Counsel insisted that the preferential setting, on the other hand, worked a hardship on his client, in that it prevented him from having adequate preparation time. Counsel maintained that if the case was restored to its original slot it would not come to trial until Tuesday or Wednesday of that week, whereas, as it was preferentially set, it would come up Monday afternoon or Tuesday morning.
The trial judge noted that the shooting occurred in March, the preliminary hearing was in April, and this was now October. In overruling the motion, the court noted that the defense was not prejudiced at all by the preferential setting and that counsel had had adequate opportunity to prepare. The judge went on to say:
 "I just don't see where you have got any kick coming about when the case is set on Tuesday or Monday afternoon or Wednesday morning. I really don't see where that works any great disadvantage to you or the Defendant in this case, . . ."
Section 11, of the Criminal Division Operating Procedure for the Tenth Judicial Circuit of Alabama reads:
 "In criminal cases where the District Attorney or attorney for the defendant desires a case be given preferential assignment, they shall apply no later than Thursday before the Monday the case is set for trial, to the Judge calling the docket the week the case is set. That Judge shall determine whether the case should be given preferential assignment and if he so decides; the case shall be assigned at once to a particular Judge for trial at 9:30 A.M. on the following Monday morning."
The defense attorney interprets this rule to mean that the presence of both the defense attorney and the district attorney is required to obtain a preferential setting. Defense counsel complains that the district attorney, knowing that he, the defense counsel, was sick, appeared before the docket control judge alone. He also contends that the State's reason for the request was frivolous because, in fact, the absent witness lived not far from Birmingham and worked at the Birmingham Municipal Airport.
It is the law of this State that the circuit court has inherent powers to make reasonable rules for the conduct of the business of the court. Brown v. McKnight, 216 Ala. 660,114 So. 40.
In Porter v. State, 27 Ala. App. 441, 174 So. 313, this court noted that an act of the legislature superceded any local rule of court that was contrary to it. However, it was quick to add that this pronouncement was not intended to: "Limit the inherent right of courts of general jurisdiction to make such rules as are necessary in the dispatch of business in said courts . ."
Further, the Alabama Supreme Court held in G. McClendonTrucking Company v. Hall Motor Express, Inc., 285 Ala. 98,229 So.2d 488, that: *Page 329 
 "The interpretation by a court of its own rules . . . is entitled to the greatest weight by a reviewing body and will be followed unless it appears to be clearly unreasonable or arbitrary."
See Alabama Public Service Commission v. Redwing Carriers,Inc., 281 Ala. 111, 199 So.2d 653.
It is without question that the Tenth Judicial Circuit of Alabama has authority to promulgate rules of procedure for the effective administration of its court business. This court will uphold the interpretation given to the local rules by the courts in the tenth judicial circuit, unless those rules appear to be "clearly unreasonable or arbitrary." McClendon, supra.
Evidently, the trial judge did not interpret the rule in question to mean that all attorneys involved are required to be present in court at the time a request for a preferential setting is made. This seems to be a reasonable interpretation of that rule from our reading of it.
We also agree with the circuit court in that we fail to see failure to grant the motion for a continuance. The granting of such motion for a continuance would only have delayed the trial of the case, at the most, three days.
The record indicates that the defense attorney had been representing the defendant from the time of the preliminary hearing which had been held six months earlier. This should have been adequate time to prepare a defense.
In our judgment, the docket control judge's interpretation of the preferential setting rule was not arbitrary or unreasonable and there was no abuse of discretion in so setting the case of the defendant for trial.
 II
The appellant next complains that the trial court abused its discretion in not allowing him additional time to obtain an absent witness, who he claims, was material to his defense, and would have been beneficial in the preparation of his case. Counsel argues that the denial of compulsory process and the refusal of the continuance prejudiced the rights of the appellant.
On October 11, 1976, approximately six months after the shooting occurred, the appellant filed a motion requesting a continuance. In that motion, he alleged that one of his witnesses was temporarily unavailable and that he had made a diligent effort to obtain his presence at trial. Further, he averred that the testimony of said witness was material and necessary and that it would not be "cumulative in nature or substance."
In the hearing held on the motion, the following facts came to light. Two witnesses, Chuck Garbart and Johnny Jones, were missing. Although counsel for defense had never talked to Garbart and Jones, he did have knowledge of what Garbart's testimony would be. The district attorney had a statement from Garbart and maintained that Garbart's testimony would be essentially the same as other witnesses that would be called on behalf of the State.
The judge remarked during the hearing that if the two witnesses and their testimony were exculpatory and different from what other witnesses might say, and they (the two witnesses) could not be found, the case might be continued. The court added, however, that if said testimony was not exculpatory and was merely cumulative, the motion would be denied. The trial judge went on to say that, since defense counsel had not availed himself of any opportunities since the preliminary hearing in April to talk with the alleged missing witnesses, the court would be compelled to look at statements these witnesses had given to the police in order to determine if the testimony would be exculpatory or cumulative.
During the hearing Sgt. Gaut testified that he talked to both Garbart and Jones and that their statements were essentially the same as other witnesses who would be called to testify. Further, Gaut responded that the testimony of these two witnesses was not exculpatory. *Page 330 
Defense counsel countered that, according to Gaut, Jones, the proprietor of the lounge, would testify that the defendant had come to a back room where a poker game was in progress and that the victim had forcibly ejected him. According to defense counsel, this was material to their case of self-defense, and the other witnesses would not be testifying to the fact of Rogers' intrusion on the poker game. At that point, the court ruled that these two witnesses' testimony was not material or exculpatory and was cumulative. Further, the court commented that Garbart would be a stronger witness for the prosecution than he would be for the defense.
In our review of the record, we find that defense counsel had reasonable time in which to ascertain what the two absent witnesses' testimony would be. Further, the court had testimony from Sgt. Gaut indicating that testimony from other prosecution witnesses would make Garbart's and Jones' testimony cumulative and not exculpatory.
In Alabama, the law is well settled that the matter of continuances in the trial of criminal cases is clearly within the trial court's discretion and such exercise will not be disturbed unless there be a clear showing of abuse. Sparks v.State, 46 Ala. App. 357, 242 So.2d 403; U.S. v. Bolton,438 F.2d 1219; Hannon v. State, 284 Ala. 487, 226 So.2d 90; Robinson v.State, Ala.Cr.App., 337 So.2d 1382; Sowells v. State, Ala.Cr.App., 339 So.2d 1090; Jenkins v. State, Ala.Cr.App.,337 So.2d 72.
Denials of such motions made due to absent witnesses are not considered an abuse of discretion where the absent witnesses' testimony would be merely cumulative. Segers v. State, 283 Ala. 694, 220 So.2d 882; Divine v. State, 279 Ala. 291,184 So.2d 628; Pounders v. State, 55 Ala. App. 204, 314 So.2d 123; Goodwinv. State, 27 Ala. App. 493, 175 So. 415.
The appellant relies heavily on Stovall v. State, 46 Ala. App. 181, 239 So.2d 323, wherein this court observed that where a showing of an absent witness's testimony had been made and where that witness had been subpoenaed, the trial court should grant a defendant a continuance, until such time as the witness could be brought in. It reasoned that a showing was the only way to "alleviate denial of compulsory process . . ."
In Stovall v. State, supra, the showing consisted of an affidavit executed by the defendant outlining what an absent witness would testify to if she were present at trial. The trial court ruled that the showing was insufficient because the attorney had not talked to the witness.
In reversing the case, this court commented that, because the trial court ruled the showing was insufficient due to the fact that the defense attorney had not talked to the absent witness, it was in essence requiring the defense counsel to vouch for the truthfulness of the contents of the defendant's affidavit. Therefore it was incumbent on the trial court to grant the defendant a continuance until such time as the witness could be brought into the court. It went on to say that there was no requirement in Alabama for the movant to vouch for the truth of what the witness would testify to if called. A showing was only to "alleviate denial of compulsory process for the witness" and therefore the lower court's ruling was error.
Based on Stovall v. State, supra, where a motion for a continuance had been made in order to obtain an absent witness's presence in court, and that motion had been denied, the trial court should either allow the defense to make a showing by way of an affidavit indicating what the absent witness would say if he were present to testify, or grant his motion for a continuance. The court in Stovall, supra, explained that the allowing of a showing by way of an affidavit was in no way an admission of the truth of what was contained in the showing. This was merely an admission that, had that absent witness been there, he would have testified as to what the affidavit said he would.
The present case can be distinguished from Stovall v. State, supra. Here *Page 331 
the defense attorney was not required to vouch for the truthfulness of an affidavit executed by his client. He was afforded an opportunity in support of his own motion to make a showing. He had known the identity of the two absent witnesses some six months, but, as of the time of the hearing on the motion, had not talked to them. There was, however, testimony at the hearing of Sgt. Gaut which indicated that the testimony of the two absent witnesses would be substantially the same as the testimony of other witnesses to be called by the State.
In our view, Stovall v. State, supra, is not applicable in the present case because there was a proper showing that the testimony at the hearing on the motion indicated that the absent witness's testimony would be cumulative.
In view of the foregoing, the trial court in denying the motion for continuance did not abuse its discretion.
 III
Thirdly, the appellant complains that during jury selection the trial judge discharged a juror without the consent of the defendant. He maintains that this was in violation of defendant's constitutional right to a struck jury, and that it was error.
We have reviewed and examined that portion of the record concerning the jurors in question and have found that, at the time jurors Ripples and Ferguson were excused, no objection was made by the defense attorney. In view of such, no alleged error is preserved for review. Williams v. State, 51 Ala. App. 1,282 So.2d 349; Douglas v. State, 50 Ala. App. 602, 281 So.2d 652.
Under the facts of this case, had there been a proper objection, the court would not have been in error. The right to excuse jurors is given to the court by statute, T. 30, § 5, Code of Alabama 1940, Recomp. 1958; Code of Alabama 1975, § 12-16-5. The statute mandates that the trial court may excuse any juror if that juror is disqualified or exempt, or if in the determination of the trial judge some reasonable cause or purpose exists for excusing the juror. Further, under this section on abuse of discretion is shown when jurors are excused without defense's consent. Mullins v. State, 24 Ala. App. 78,130 So. 527.
The record clearly indicates that the trial judge, in exercising his discretion to excuse jurors, was fulfilling his duty to provide both the State and the defendant with a fair and impartial jury. In doing so he did not abuse the wide discretion granted to him for this purpose. Biggs v. State,20 Ala. App. 449, 103 So. 706.
Under these circumstances, excusing the jurors was not error.
 IV
A fourth claim of error concerns the admission of evidence of specific statements made by the accused, following the shooting, while he was being detained by the police. The appellant insists that they were not part of the res gestae and were inadmissible.
During a voir dire hearing on the admissibility of these statements made by the appellant, Officer Stidham testified as follows:
. . . . .
"A What did he say?
"Q You said he said something?
"A He said, `You're the man with the shotgun.'
"Q You're the man with the shotgun?
"A Yes, sir.
"Q Did he say anything else to you?
"A Yes, sir.
"Q What did he say?
 "A He said, `Watch your darkest corners when you arrive on a scene like that.'
"Q Did he say anything else?
"A Yes, sir, he did.
"Q What did he say?
 "A He said I was lucky he — `I didn't have nothing against you or I would have killed you too.'
"Q Did he say anything else?
"A He said one other thing, I believe. *Page 332 
"THE COURT: What was that?
"A `I got the man I wanted.'"
Whether or not the above statements are part of the res gestae is not important because the contents of these statements were not self-serving. Simmons v. State, 39 Ala. App. 477, 105 So.2d 691. Acts and declarations of an accused before or after the offense, whether a part of the res gestae or not, are admissible against him. Only when admitted for his benefit must they be part of the res gestae. Hoback v. State, Ala.Cr.App., 338 So.2d 439; O'Neal v. State, 53 Ala. App. 133,298 So.2d 62; Mitchell v. State, 52 Ala. App. 174,290 So.2d 241; Easley v. State, 56 Ala. App. 102, 319 So.2d 721.
All extra judicial admissions are prima facie involuntary and inadmissible, and the trial judge has the duty to determine their voluntary nature before admitting them. Hines v. State,260 Ala. 668, 72 So.2d 296. The statements in the present case were not given in response to any question asked to the defendant, but were made freely of his own volition, a factor in itself, demonstrating the voluntary nature of the statements. Barnes v. State, 45 Ala. App. 6, 221 So.2d 399.
The test for the voluntary nature of an extra judicial confession or inculpatory statement is whether in the light of all the surrounding circumstances, the statement was free from inducement, threat or promise, either express or implied, which would have produced in the mind of the accused any fear of harm or hope of favor. Guenther v. State, 282 Ala. 620,213 So.2d 679; Bass v. State, 55 Ala. App. 5, 312 So.2d 576; Bell v.State, 5 Cir., 367 F.2d 243.
 V
Appellant insists that the court abused its discretion in not granting a continuance on the basis of a newspaper article concerning the case which appeared in the Birmingham News one day prior to jury selection. Appellant argues that such article would tend to inflame the minds of prospective jurors against those who are charged with crimes, and for that reason a continuance should have been given.
During the hearing on the motion for continuance, counsel for the defense made the following comments concerning the article.
 "MR. WAITES: Motion for continuance based on an article from the Birmingham News yesterday.
"THE COURT: Article in the Birmingham News?
 "MR. WAITES: Yes, sir. I think you have the original there. Don't you have the original motion?
 "THE COURT: You mean the Birmingham News is writing about this case? You mean this general article here?
 "MR. WAITES: Yes, sir. That on the first and second page, and I have witnesses that would ask the Court to allow me to present on behalf of this motion. That's the reason I asked which we were going to take up first.
"THE COURT: What witnesses?
 "MR. WAITES: I have about five lawyers at this time and, of course, I was not aware of this until yesterday and I have not had an opportunity as you know, I was in Federal Court until 11:30 in the morning. I have not had an opportunity to contact and prepare to present witnesses on this motion this quickly.
 "THE COURT: I'm not going to continue the case just because of this article.
 "MR. WAITES: Are you denying me the right to present witnesses?
 "THE COURT: If all the lawyer is going to say in his opinion nobody could get a fair trial because of this article.
"MR. WAITES: Judge, I have talked to —
 "THE COURT: Unless they have some peculiar insight that other people are not privileged to.
 "MR. WAITES: I have an offer to this Court, at least three people that I have talked to, and would proffer their testimony to say that based on the article that I have attached to the motion that this *Page 333 
Defendant of this charge in their opinion could not get a fair and impartial verdict. I'm telling the Court that I was limited for time because of my being required to be in Federal Court this morning at 9:30, and I have been limited in obtaining —
 "THE COURT: I'll let the lawyers get up and say that. Call your first one.
. . . . .
"THE COURT: I thought you said you had five here.
 "Mr. WAITES: I told you that I had contacted at least three lawyers about testifying.
"THE COURT: Jim Fullan and who else?
 "MR. WAITES: No, I couldn't get him. Fred Erben, Charles Purvis, Louis Wilkinson and Chuck Tarter. I walked into your chambers and asked you which motion we were going to take up because I had to round up some witnesses and you said let's get at it. I have not had an opportunity to subpoena them. I have not had time. If I can have 30, 45 minutes.
 "THE COURT: I don't think we need to do that, Mr. Waites. All of them are good layers, honorable people, and I accept what they say, but I'm not going to continue the case because of this motion and because they would testify that this Defendant couldn't get a fair trial in this case.
 "MR. WAITES: Then I except to the Court's ruling on the motion, and especially we except to the Court not allowing me to put witnesses on the witness stand.
 "THE COURT: You're telling me what they would say and I'm telling you if they would say that, no questions asked on cross examination, I would rule — that I would not continue the case.
 "MR. WAITES: I'm saying based on what I have been told they would say this Defendant could not get a fair trial in this Court this week.
"THE COURT: Okay.
"MR. WAITES: And we except to the Court's ruling."
Newspaper publicity concerning a particular crime does not, in, and of itself, constitute grounds for continuance.Littlefield v. State, 36 Ala. App. 507, 63 So.2d 565. A denial of a motion for continuance, because of unfavorable publicity, is not an abuse of discretion where the concerned articles are merely of a narrative nature. Collins v. State, 234 Ala. 197,174 So. 296. See Jenkins v. State, Ala.Cr.App., 337 So.2d 76.
A review of the newspaper article in question was a general press release concerning the case. Such a news item was not of such an inflammatory nature as to require the trial judge to grant the motion for a continuance in order to protect the rights of the defendant.
The defense counsel had ample opportunity to question the prospective jurors concerning their knowledge of what was involved in the newspaper article and what prejudice, if any, it might have caused in their minds. See Murphy v. Fla.,421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589.
 VI
The last assignment of error concerns the admissibility of statements by the defendant which are claimed to have been made while the defendant was in an intoxicated "manic condition" thereby, rendering him unconscious of such statements.
The appellant cites us to four incidents in the record which he relies on to show the defendant's intoxicated condition.
. . . . .
 "Q He appeared to be intoxicated at that time, didn't he?
"A He was drinking.
 "Q Well, didn't he appear to be intoxicated in your opinion?
 "A Well, it was hard to say. I could tell that he was drinking.
"Q All right, sir.
 "THE COURT: Let me ask you this, sir. This is a hypothetical question. If you had seen him on the street would you have arrested him for being a public drunk? *Page 334 
"A It's a possibility."
. . . . .
 "Q I'll ask you if I didn't ask you, `As a matter of fact, he was babbling to a certain extent?' And you didn't say, `Yes, sir, he was talking. He appeared to be very excited and he was talking very freely?'
"A Yes, sir, I believe I did say that.
. . . . .
 "Q All right. You could smell whiskey on him, couldn't you?
"A Yes, sir, I could.
 "Q And he told you that he had been drinking whiskey most of the day, didn't he?
"A Yes, he did.
. . . . .
"VOIR DIRE EXAMINATION
. . . . .
 "Q. All right. Based upon what you saw at that time and your observations, was he intoxicated?
"A No, sir.
 "Q Do you know whether or not you could tell he had been drinking?
"A Yes, sir, I could tell that he had been drinking."
In Edwards v. State, 56 Ala. App. 405, 321 So.2d 744, this court held that:
 "In this jurisdiction only proof of intoxication amounting to `mania' will render a confession inadmissible."
A lesser state of intoxication would not render a confession inadmissible. Balentine v. State, Ala.Cr.App., 339 So.2d 1063;Patterson v. State, 56 Ala. App. 359, 321 So.2d 698; Carter v.State, 53 Ala. App. 43, 297 So.2d 175.
In order for intoxication to render a confession inadmissible, it must be shown that the mind would have been impaired substantially. Ray v. State, 39 Ala. App. 257,97 So.2d 594.
Intoxication which would affect the voluntariness of the confession is a question of fact which the trial judge must first determine before allowing it to be submitted to the jury for their consideration. Anderson v. State, 45 Ala. App. 653,235 So.2d 902.
Where ample evidence, even though conflicting, exists from which the trial judge could conclude that the appellant was not intoxicated to the extent of mania, the admission of a confession for a jury's consideration is not an abuse of discretion.
The testimony in this case indicated that the man may have been intoxicated and possibly could have been arrested for public drunkenness but his intoxicated condition did not reach the stage of mania. Woods v. State, 54 Ala. App. 591,310 So.2d 891. As in Anderson, supra, there was no abuse of discretion shown in this case. The evidence indicates that the appellant was in a somewhat emotional state after he had learned that he had shot the wrong man, but nowhere does it show that he was not sufficiently in control of his faculties.
Due to the fact that no proof of mania was shown, as a result of this defendant's intoxication, the trial court's decision in admitting these statements was correct.
We have examined the record and transcript of evidence in this case and have found no error, therefore, the judgment is due to be affirmed.
AFFIRMED.
All the Judges concur.