298 So.2d 62

**William L. O'NEAL, alias**

**v.**

**STATE.**

**5 Div. 197.**

Court of Criminal Appeals of Alabama.

June 4, 1974.

Rehearing Denied June 28, 1974.

Clellon K. Baeder, Huntsville, for appellant.

**134**

William J. Baxley, Atty. Gen., Montgomery, Francis A. Poggi, Jr., Sp. Asst. Atty. Gen., Fairhope, for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and received a life sentence in the pentitentiary. Prior to arraignment, he was determined to be an indigent and two lawyers were appointed to represent him. He interposed two pleas to the indictment, (1) not guilty and (2) not guilty by reason of insanity. Appellant did not testify and offered no testimony in his defense. Since there was no evidence introduced in support of his insanity plea, the trial court did not submit that issue to the jury. Trial counsel was appointed to represent appellant on this appeal.

On the night of October 17, 1972, three black men drove within a block of a store located on Dean Road in Auburn, Alabama. Two of the men entered the store and the third remained on the outside in front of the store. They were subsequently identified as appellant, Clarence Cofield, and Norris Lee Floyd. Appellant and Cofield went inside the store. Appellant was armed with a pistol and Cofield had a knife.

While the two were inside the store an Auburn student, Alfred Cook, drove up and parked his car and started to enter the store. Floyd stopped him and told him not to go in the store as a "stickup" was in progress. Cook retreated to his car and Floyd got in the car on the passenger side. Cook asked him if he was in on this and Floyd said, "Hell, no. Let's get out of here." Cook backed out to go to a nearby self-service station to call the police and Floyd rode with him. As Cook was driving from the store, he saw two black men come out of the store and run into the woods near the store. Cook told the operator at the service station to call the police as a robbery had occurred at the store. After the police were alerted, Cook and Floyd drove back to the store where Cook told Floyd to "Let's go inside and check on the man and see if he's all right, if we can help him." They got out of the car and started in the store when Floyd stopped and said he didn't want to go in there, saying, "The man is liable to be dead." Floyd then disappeared into the night.

Lieutenant Frank DeGraffenried of the Auburn Police Department got the robbery call at 8:45 P.M. and arrived at the store at 8:47 P.M. He went in the store and found the body of the owner and operator of the store, Charles Kirkley, lying on the floor behind the check-out counter. He testified:

"Well, the body was lying kind of face down; he had a hat, a brown hat clutched in his hand; it was mostly under him. I felt for a pulse and I didn't find any pulse and I felt on his back and I felt a little lump under the skin. There was a black hat laying on the floor and a black wig laying on the floor, a gold-colored watch, and there were signs of a scuffle. Things had been knocked off the shelves and laying around on the floor."

This witness also found an open brown paper bag on the floor near the cash register. He observed currency in the bag.

The Lieutenant did not touch any thing on the floor and in the store except in feeling the body to see if the man was alive. He called Mr. Carlos Rabren and Mr. Richard Roper of the State Department of Toxicology and Criminal Investigation at Auburn and they immediately came to the scene of the homicide. Lieutenant Ronnie Watkins of the Lee County Sheriff's Department was called to take photographs of the store and scene of the homicide, including the body, the black hat, brown hat, black wig, the bag of money, a paring knife on the floor, and items or articles which had been knocked from the shelves and were lying on the floor, and some broken glass jars scattered around on the floor. After proper predicate was laid these photographs were admitted into evidence over appellant's objections.

The body was carried to the morgue room of the Lee County Hospital where a post mortem examination was conducted by Mr. Roper at 10:30 P.M. on the night of the killing. Mr. Roper's qualifications were admitted by the attorneys for appellant, and he gave the following description of the general external examination:

"I found eight wounds on the body. There was a deep, cleancut laceration two and a quarter inches in length across the point of the chin, across this general area on the middle of the chin. A cleancut laceration measuring one-half inch in length was found on the superior left chest in the upper portion of the left side of the chest. A third cleancut wound one-half inch in length was observed on the left chest, five inches left of the midline and located on the nipple line in this location here (indicating). There is an abrasion on the anterior chest right above the breastbone. A circular penetrating wound was observed in the middle of the left chest in approximately this location here (indicating), one and a half inches above the common nipple line. The wound was approximately midline of the chest. A cleancut superficial laceration one and a quarter inches in length was noted on the posterior surface of the right upper arm in this area here (indicating). The other remaining wounds on the body were small superficial scratch-type lacerations."

After disrobing the body, Mr. Roper took photographs of the external wounds above described and these photographs were received in evidence over objections of appellant that they were calculated to inflame the passions of the jury and had no probative value in the case.

After the external examination, Mr. Roper performed a thoracic abdominal examination and also a cranial examination. He described his findings as follows:

"I found on examination of the organs of the chest from the hemorrhagic path from the wound in the middle of the chest, another hemorrhagic path which penetrated down through the breastbone through the right lung and through the aorta which is the main artery out of the heart supplying the body, the pulmonary trunk, which is the artery from the heart to the lungs, and the path went through these arteries and then again went through the right lung and into the musculature of the back. Within the musculature of the back, I removed a large caliber bullet."

He expressed the conclusion that death resulted from hemorrhage and shock associated with a gunshot wound to the middle of the chest in which two major arteries were penetrated. It was also his opinion that the cleancut wounds or lacerations on the arms, chin and body of the deceased were made by a knife or a knife-like object.

Mr. Carlos Rabren, Assistant Director of the Alabama Department of Toxicology and Criminal Investigation in Auburn, testified that he was at the scene of the crime at the same time as Mr. Roper. He said, "I noticed and recovered from underneath the right side of the body, a brown or tan-colored hat; and laying next to the left foot of the body, partially on the left foot of the body, was a black-colored hat. Just outside the cashier's booth, behind a vacuum-type machine that was turned over was a black Afro-type wig there at the scene."

This witness further testified that he found a paring knife not too far from the wig and a broken piece of blade from this knife near the vacuum machine. He said that the knife had bloodstains on it, and there were bloodstains on the broken blade.

Mr. Rabren took possession of these articles, put identifying marks or tags on them, and the next morning he turned them over to Mr. Tellis D. Hudson, a crime laboratory technician of the Department of Toxicology. Mr. Hudson was called as a witness for the state and testified that he had possession of all the articles he had received from Mr. Rabren and that they were in the same condition as they were in when he received them. They were admitted in evidence over appellant's objections that they were without probative value in this case.

In the course of their investigation, the officers located Cofield and Floyd in Henry County. Cofield had been convicted in Henry County for robbery, kidnapping and rape for which crimes he was sentenced to sixty-five (65) years in the penitentiary. Floyd was serving twenty years for robbery. (Floyd's conviction was affirmed by the Court on March 5, 1974). The officers interviewed these two men on November 8, 1972, approximately three weeks after the Kirkley murder in Auburn. Following this interview, the officers went to the Houston County jail where they interviewed appellant. They told him he was a suspect in the Lee County murder, along with Cofield and Floyd, and gave him the *Miranda* warnings. They presented him with a waiver of rights form including his right to counsel but he refused to sign the waiver. He denied any involvement in the murder of Kirkley. At the conclusion of the interview of appellant, the officers started to leave the room whereupon appellant said, "I want to say one more thing, that if anything did occur in Auburn, Blue (his nickname) didn't do it, we done it." In saying, "We done it", appellant implicated himself, Cofield and Floyd.

The Grand Jury of Lee County returned separate indictments for murder in the first degree against this trio. Prior to appellant's trial, Cofield and Floyd pleaded guilty to the murder charge and were each sentenced to life imprisonment. The district attorney told them if they would agree to testify against appellant and tell the truth, he would recommend to the trial court that their sentences run concurrently with the sentences they were then serving. They agreed and both testified for the state.

According to Cofield's testimony, he, appellant and Floyd drove to Auburn on the night of October 17, 1972, to rob the store in question. He said the automobile belonged to and was driven by appellant. They parked on a street one block behind the store and walked along a path through the woods to reach the store; that when they arrived, Floyd said he did not want to go in the store and remained outside. He and appellant went inside the store. Appellant stopped up front and he went to the back. He heard a commotion and returned to the front and saw appellant pointing a pistol directly at the deceased; that the de-

ceased and appellant started tussling and he pulled his knife out and got in the tussle too during which time he put two or three scratches on the man with his knife; that he got knocked around and started to leave the store when he suddenly heard a shot; that appellant was the only person he saw with a pistol in the store that night. He further testified that when they went in the store, appellant was wearing a black wig and a black hat. He claimed he did not wear a hat. He was shown the wig and the hat already in evidence but claimed they were not the ones worn by appellant that night; that the wig was not bushy enough and the hat worn by appellant was grayish in color. He further testified that after the shooting all three of them got back in appellant's car and went back to Opelika and then on to Lanett, his hometown. He said all three of them rode to LaGrange, Georgia, the next morning and pawned the pistol.

Floyd testified that he, appellant and Cofield went to the store that night, but he did not go inside; that appellant and Cofield went in the store. While he was waiting on the outside a car drove up and parked in front of the store. The man got out of the car and started to enter the store and he told the man not to go in there. When he saw the man was going to enter the store anyway, he ran from the scene and returned to the parked car and waited for the other two men. He further testified that he could not say if anyone wore a black wig or hats that night but he knew he did not wear a hat and did not enter the store. His testimony did not help the state or hurt appellant except in putting him at the place of the homicide.

The state produced two witnesses from Shawmut, Alabama, Mr. Jim Lockhart and Mr. Dorsey Breedlove. Lockhart testified that a week or ten days prior to October 17, 1972, when Mr. Kirkley was killed in Auburn, he was in the Village Curb Mart in Shawmut when three black men entered this place of business and the three went in different directions. He said there were two other people in the curb mart besides himself when these men came in—the wife of the owner and an employee, Mr. Breedlove; that these black men were acting so strangely that he decided to stay around. He said he did not know the names of these men that night but subsequently learned they were appellant, Cofield and Floyd. He described appellant as wearing a black hat and an Afro-type hair style and that Cofield had on a brown hat. Floyd was not wearing a hat. He said appellant went to the produce counter where Breedlove was working and bought some grapes. These men stood around talking for a few minutes and left in an automobile. Mr. Lockhart got in his car and followed them for three-quarters of a mile and got the tag number. He came back to the curb mart and gave Mr. Breedlove the tag number. Lockhart was shown the black hat, black wig and brown hat and he stated they resembled the ones worn by appellant and Cofield the night they came in the curb mart.

Mr. Breedlove testified that he was the produce man at the Village Curb Mart in Shawmut, Alabama, the night Mr. Lockhart was present and when those three black men came to this place of business. He testified this was the third time these men had been in the curb mart that week. According to him the last occasion was a week or ten days before the Kirkley murder in Auburn. He later learned their identity as appellant, Cofield and Floyd. He testified that on each occasion that these men came in the curb mart, appellant was wearing a black hat and had bushy hair and Cofield was wearing a brown hat. Floyd did not have on a hat. He identified the black hat and black wig as resembling the ones worn by appellant and the brown hat as resembling the one worn by Cofield. Breedlove said that Lockhart followed these men the night he was there and returned and gave him the tag number but that he had already gotten the tag number on one of the other two occasions these men had been to the curb mart that same week.

On April 26, 1973, Mr. Ted Murphy, a police sergeant of the Auburn Police Department, and Lieutenant Frank De-Graffenried, went to Mt. Meigs' Receiving and Detention Center to interview appellant. Prior to interrogating him they gave him the *Miranda* rights and warnings and he told the officers that he understood his constitutional rights and his right to counsel before and during the interrogation. Appellant voluntarily signed the following waiver of counsel form:

"WAIVER OF COUNSEL BY DEFENDANT IN CUSTODY

"I, William Lenton O'Neal, have been informed by the undersigned law enforcement officers, prior to being questioned by them, that I am suspected of the offense of Murder in Lee County, Alabama, on the 17 day of Oct., 1972, and have been informed by them of my Rights as follows:

1. That I may remain silent and do not have to make any statement at all.

2. That any statement which I might make may be used against me in Court.

3. That I have a right to consult with an attorney before making any statement and to have such attorney present with me while I am making a statement.

4. That if I do not have enough money to employ an attorney, I have the right to have one appointed by the Court to represent me; to consult with him before making any statement; and to have him present with me while I am making a statement.

5. That if I request an attorney, no questions will be asked me until an attorney is present to represent me.

"After having my Rights explained to me, I freely and voluntarily waive my rights to an attorney. I am willing to make a statement to the officers. I can read and write the English language and fully understand my Rights to an attorney. I have read this Waiver of Coun-sel and fully understand it. No threats or promises have been made to me to induce me to sign this Waiver of Counsel and to make a statement to the officers.

This 26 day of April, 1973.
"/s/ William L. O'Neal

"All of the Rights in the above Waiver of Counsel were read and explained to the above defendant by me and he freely and voluntarily waived his right to an attorney. No threats, promises, tricks, or persuasion were employed by me or anyone in my presence to induce him to waive his rights to an attorney and to make a statement without an attorney. He freely and voluntarily signed the above Waiver of Counsel in my presence after having read it.

"/s/ Ted Murphy
Sergeant, Auburn Police Dept.
(Title)
9:44 AM    4-26-73

"Witness by:

/s/ Lt. Frank M. de Graffenried
Auburn Police Dept. 26 April 1973
APD   11-72"

These officers told appellant they wanted to talk to him about the Kirkley killing in Auburn on the night of October 17, 1972, and appellant made a statement. The *pre-Miranda* predicate was laid and officer Murphy testified as follows:

"He stated that on October 17, 1972, he, Cofield and Floyd were all three together in his car, which was a 1969 Ford Fairlane 500; that they were in Birmingham, Alabama, watching a parade up there. He couldn't remember what kind of a parade, but a parade up there that contained two V.I.P.s—Actor James Stewart and Governor George Wallace, Governor of Alabama."

Appellant further told the officers that on the 18th day of October, 1972, the next morning after the killing he went to Auburn and bought a gun from Johnny Fow-

ler for $10.00. The officers checked this out with Fowler and found it to be true. Appellant told the officers that on October 21, 1972, he and Cofield and Floyd left the Opelika-Auburn area and went to Ohio and came back on October 31st. (We note here that the record of Floyd's conviction for robbery in Henry County shows that on the night of October 24, 1972, three black men robbed a truck stop in Abbeville, Henry County, Alabama. The cashier and cook were the only persons in the truck stop when the three men came in and they closely observed them on two occasions that night. The officers showed the cashier and cook eighteen photographs of different men, including the three robbers, whom they had never seen prior to October 24. Without the slightest hesitation, they, separately, picked out the three men.)

The final witness for the state was Captain C. H. Pitts of the Birmingham Police Department. He testified that he was in charge of the Traffic Division and as such led all important parades through the streets of Birmingham. He further testified that there was no parade in Birmingham on October 17, 1972, wherein Governor George Wallace and Actor James Stewart took part. He said that Governor Wallace and Actor James Stewart were in the Veterans' Day Parade that began at 2:00 P.M. on October 23, 1972, and that he led the parade. Captain Pitts brought with him a copy of the permit signed by the Mayor of Birmingham on October 11, 1972, granting a parade permit to the Veterans' Day Parade Committee to be held on October 23, 1972, beginning at 2:00 P. M. to contain 160 units consisting of bands, marchers and floats. This parade permit copy was received in evidence without objections.

Appellant was indicted on May 11, 1973. Prior to arraignment on May 24, 1973, the court ascertained that appellant desired the services of an attorney to represent him but was financially unable to retain counsel. The court appointed two aggressive and resourceful lawyers to defend him in the court below and also appointed them to represent him on appeal. The case was set for trial on May 28th. On May 25th appointed counsel filed a written motion for a continuance, supported by affidavit, alleging that due to the seriousness of the crime charged and the amount of preparation necessary, they could not properly prepare for the trial on May 28th.

The case came on for trial on May 29, 1973. After the jury was qualified counsel for appellant brought up the motion for a continuance stating that on that morning appellant gave them the name of a witness, Johnny Fowler, who lived in Auburn, that he wanted to subpoena in his behalf. Counsel further stated that on May 25th, the previous Friday, appellant gave them the name of another witness in his behalf. These were the only two witnesses appellant had given his counsel. The name of the witness given counsel on the previous Friday was Carrie Maddox, whose address was the Hardaway Home in Opelika. Counsel told the court they had searched for Carrie Maddox over the weekend but had not been able to locate her. The court directed the clerk to issue subpoenas for these two witnesses. Thereupon the jury was struck and the court asked appellant's counsel if the two witnesses subpoenaed at his request were in court and counsel replied they were in court. The court then overruled the motion for a continuance. These two witnesses were never called to the witness stand by appellant.

While five days was scant time to prepare for trial, we cannot say the trial court was guilty of gross abuse of discretion in overruling the motion for a continuance. Trial counsel tried the case expertly. They were vigorous in the cross-examination of the state's witnesses and made numerous motions to exclude the testimony of various witnesses. Street v. State, 39 Ala.App. 190, 96 So.2d 680; Burleson v. State, 22 Ala.App. 526, 117 So. 500; Wyatt v. State, 35 Ala.App. 147, 46 So.2d 837; Gandy v. State, 49 Ala.App. 123, 269 So.2d 141.

There can be no question but that appellant, Cofield and Floyd were accomplices in the attempted robbery of Kirkley and his resultant death. It was, therefore, incumbent upon the state to produce evidence corroborative of the testimony of Cofield and Floyd.

In Slayton v. State, 234 Ala. 9, 173 So. 645, we find this pronouncement by our Supreme Court:

"It should be kept in mind that corroborative evidence of an accomplice is of two kinds. One includes facts and circumstances ascertained in checking up on his version of the affair, matters tending to support the truth of his testimony, or vice versa. The competency of this class of circumstantial evidence does not turn on whether it tends to conduct the defendant with the crime. The other class, one essential to conviction, is corroborative evidence which does tend to connect the defendant with the crime. This latter class must be proven beyond a reasonable doubt. As to the other, the jury may not believe the evidence of the accomplice beyond a reasonable doubt with respect to details, but still believe his evidence on the facts essential to a conviction beyond a reasonable doubt, and, if corroborated as the law requires, a conviction should follow. * * *"

In Cameron v. State, 49 Ala.App. 482, 273 So.2d 242, certiorari denied, 290 Ala. 363, 273 So.2d 248, this court held:

"Under the statute requiring corroboration of the testimony of accomplices to authorize conviction of a felony (Title 15, Section 307, Code of Alabama 1940), the corroborative evidence need not be strong, nor sufficient of itself to support the conviction, the criterion being that it legitimately tends to connect the accused with the offense. 23 C.J.S. Criminal Law § 812(5), page 125; Moore v. State, 30 Ala.App. 304, 5 So.2d 644.

"Nor need such corroborative evidence directly confirm any particular fact stated by the accomplices. Skumro v. State, 234 Ala. 4, 170 So. 776."

In Stokley v. State, 254 Ala. 534, 49 So. 2d 284, we find this expression:

"It is well established that when, by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act. Such community of purpose or conspiracy need not be proved by positive testimony. It rarely is so proved. The jury is to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case. Morris v. State, 146 Ala. 66, 41 So. 274, and cases cited; Jones v. State, 174 Ala. 53, 57 So. 31; Teague v. State, 245 Ala. 339, 16 So.2d 877.

"When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not. Jones v. State, supra; Jolly v. State, supra; Tanner v. State, 92 Ala. 1, 9 So. 613."
[3] And,

"Any circumstantial evidence is sufficient to corroborate if it proves that accused was connected with the criminal act, or tends to connect him with the commission thereof, or if such connection may reasonably or clearly be inferred from the corroborative evidence;

and where the accomplice is strongly corroborated by facts and circumstances connecting accused with the crime, a conviction will be sustained." 23 C.J.S. Criminal Law § 812(3), p. 109.

 The testimony of Lockhart and Breedlove that a week or ten days prior to the Kirkley killing that three black men entered the Village Curb Mart in Shawmut, Alabama, and that one had on a black hat and was wearing an Afro-type hair style and one of the others had on a brown hat and that the black hat, black wig, and brown hat found by the officers a few minutes after the homicide closely resembled what the two men had on when they were in the Village Curb Mart was clearly admissible. This is especially true in the light of Cofield's testimony that appellant was wearing a black hat and a black wig at the time they entered the store where the body of the deceased was found. The rule is that acts, declarations, and demeanor of an accused, before or after the offense, whether a part of the res gestae or not, are admissible against him, but unless a part of the res gestae are not admissible for him. Smarr v. State, 260 Ala. 30, 68 So.2d 6; Espey v. State, 270 Ala. 669, 120 So.2d 904; Goodman v. State, Ala.App., 291 So. 2d 358.

■ The voluntary statement appellant made to the officers in the Dothan jail on November 8, 1972, that "if anything did occur in Auburn, Blue (his nickname) didn't do it, we done it", was an inculpatory admission. The interview had already been concluded and the officers were leaving the room when appellant stopped them saying, "I want to say one more thing," and then made the above statement. This statement was clearly admissible under Guenther v. State, 282 Ala. 620, 213 So.2d 679.

Appellant's alibi that he, Cofield and Floyd were in Birmingham on the afternoon and night of the killing watching a V.I.P. parade in which Governor Wallace and movie actor James Stewart took part was shot down when it was shown that the parade in which Governor Wallace and Mr. Stewart took part was held on October 23, 1972.

From what we have said the evidence presented by the State was sufficient to make the guilt vel non of appellant a jury question and the jury resolved that issue against him. There was no error in overruling the numerous motions to exclude the state's evidence, nor was there error in refusing the several affirmative charges. Likewise, there was no error in overruling the motion for a new trial.

The case is due to be affirmed and it is so ordered.

Affirmed.

All the Judges concur.