Huey Edward Coon was charged in a four-count indictment under Alabama's Death Penalty Statute, § 13-11-1, through § 13-11-9, Code of Alabama 1975, for the intentional killing of John Ezra Brown by striking him about his head and body with a heavy instrument and by stabbing him with a knife while in the commission of a robbery during which some $190.00 was taken.
The jury found the appellant "guilty as charged in the indictment" and fixed punishment at death by electrocution.
Thereafter, the trial court conducted a post-conviction hearing on the aggravating as well as the mitigating circumstances as required by law. The trial judge found three aggravating circumstances, but found no mitigating circumstances, and set appellant's sentence as death by electrocution.[1]
In the early morning hours of August 29, 1978, while working as a clerk-manager in a Zippy Mart in Andalusia, John Ezra Brown was stabbed with a knife and beaten with a *Page 982 
blunt instrument. He was taken to a hospital and died later that morning.
Dr. Nathan D. Fiebelman testified that he examined and treated the deceased, Brown, in the emergency room of the Andalusia Hospital that same morning. He described in detail the numerous head injuries, such as multiple fractures, and massive bleeding within the cranial bowl, received by the deceased, and expressed the view that these injuries were caused by repeated blows from a heavy object, and by stabbing with a knife on the neck and back.
Jake Whatley testified that he drove a truck and regularly delivered the Montgomery Advertiser to the Zippy Mart in Andalusia. Whatley indicated that, as he arrived at the store shortly before 3:00 A.M., on August 29, 1978, two other vehicles arrived at the same time. While the drivers of the other vehicles conversed outside the store, Whatley went inside and found John Ezra Brown lying on his side near the cash register.
Whatley testified that he ran outside, called to one of the other drivers for help, re-entered the store with the other driver and saw that Mr. Brown was bleeding profusely. He then drove his truck to the Andalusia Police Department, reported the incident, and returned to the Zippy Mart. When the ambulance arrived, Whatley helped load the victim into it. On cross-examination, Whatley testified that he did not know the defendant and had not seen him at the Zippy Mart.
Mozelle McCurley testified that she was the manager of the Zippy Mart in Andalusia. She stated that as soon as she learned of the robbery she went to the store and gave Lt. Knox of the Andalusia Police Department a key which he used to lock the store.
Richard McCurley testified that he managed the Zippy Mart each day from 3:00 P.M. to 11:00 P.M. He stated that, when he went off duty at 11:00 P.M., on August 28, 1978, John Ezra Brown signed for the contents of the store's cash register, which contained approximately $200. in cash. He further testified that, Budweiser beer was being sold on special at that time, for $2.09 per six-pack.
James McCurley stated that he was the supervisor for Zippy Mart in the area. On the morning of August 29, 1978, after learning of the robbery, he went to the police station where he was shown two six-packs of Budweiser beer, one of which had a can missing. He stated that he recognized the price labels on the beer as being those used by Zippy Mart and that, he recognized the price of $2.09, appearing on the two six-packs as being the special price for which Zippy Mart was selling the beer at that time.
The witness also related that about 10:30, on the morning of the incident, he went to the Zippy Mart and unlocked it to allow two investigators access to the scene and he stayed in the store until the investigators had finished their examination.
The district manager for Zippy Mart, Luther Quillen, testified that on the morning of the incident he went to the store and inventoried the store's cash register and safe and found a shortage of $190.34.
Wilson J. Keller's testimony corroborated that of Jake Whatley. Keller stated that he arrived at the Zippy Mart about 3:00 A.M., on August 29th and that two other drivers arrived about the same time. While Keller talked outside with one driver, the other entered the store, but came back outside immediately and called to him. He then entered the store, saw the bloody condition of Mr. Brown, and while the other driver left to get the police, Keller used his C.B. radio to try and get help. Keller also stated that as he was helping the ambulance attendants load Mr. Brown into the stretcher, he noticed the cash register drawer was empty except for a few pennies.
Investigator for the State Department of Forensic Sciences, G.R. McCahan, Jr., testified that he performed a post-mortem examination on the body of John Ezra Brown. He stated that Brown died as a result of massive, multiple skull fractures and massive cranial bleeding caused by repeated blows to the head. He also observed stab *Page 983 
wounds on the neck and back. Furthermore, he said he secured several items from the body of Mr. Brown and from the scene of the crime for possible use as evidence.
Lt. J.T. Knox of the Andalusia Police Department testified that, at 3:00 A.M. on August 29th, he and another policeman, Farris Wood, were dispatched to the Zippy Mart where he helped Mr. Keller and Mr. Whatley load Mr. Brown onto the stretcher and into the ambulance. He noticed that the store's cash register was open and empty, except for change. He also noticed that a metal milk crate on the floor was close to where Mr. Brown's head had been lying. Lt. Knox recalled that after Mrs. McCurley locked the store, he proceeded to Eighth Avenue where he found Officer Wood and Lt. Glass talking to a suspect, Ernest Marvin. Marvin was taken to the police station by Lt. Knox and placed in a cell.
Another suspect, Charlie Jenkins, was brought in by Officer Wood and also placed in a cell. Thereafter, about 5:00 A.M., Knox and Wood returned to Eighth Avenue, found the defendant, and placed him in custody, and took him to the police station. Lt. Knox stated that he did not have an arrest warrant for the defendant when he took him in custody; that, he did not inform him that he had the right to consult an attorney; that, he did not inform him for what purpose he was being detained, nor did he explain to the defendant that he was under arrest, although he handcuffed the defendant when he placed him in the patrol car.
Lt. Knox indicated that all three suspects had been drinking something alcoholic but that in his opinion the defendant was not intoxicated.
Andalusia Investigator, Lt. Charlie Glass, testified that about 3:00 A.M., on August 29th, he was called to investigate a crime at the Zippy Mart. He said that he noticed that the cash register drawer was open and contained only change, and that a bent metal milk create, smeared with blood and hair, was found near the cash register. He locked the metal milk crate in the trunk of his police car and drove to Eighth Avenue where he and Officer Wood took Ernest Marvin in custody. Lt. Glass stated that while Lt. Knox took Marvin to the police station, he and Officer Wood drove to the home of Charlie Jenkins and were invited inside by him.
While inside, the two officers found eleven cans of cold and frosted beer under a cake cover in the kitchen. Jenkins was then taken in custody and driven to the police station by the two officers, along with the beer. Shortly after, Coon, the defendant was brought to the police station.
Lt. Glass read him (Coon) his Miranda rights and the defendant signed a waiver form. Coon denied knowing anything about the incident at the Zippy Mart. Lt. Glass stated that he questioned the defendant again later that morning, and again the next day. On both occasions he advised the defendant of hisMiranda rights, and the defendant signed waiver forms prior to questioning.
Glass also related that on August 31st, he and Deputy Howard Easley, along with an investigator for the district attorney, Jim Stallings, went to an alley near Eighth Avenue, where they found some burnt clothing and two magazines, "Club" and "High Society." According to Glass, although three stores in Andalusia sell "Club," only the Zippy Mart sells "High Society."
Thereafter, on September 5th, this same group returned to this same alley and found a blade from a paring knife and additional items of clothing.
Lt. Glass admitted on cross-examination that to his knowledge, none of the items found in the alley were in any way connected to the defendant, Coon.
Officer Farris Wood of the Andalusia Police Department, testified that he lived on Eighth Avenue, three houses away from where Charlie Jenkins lived with his sister, Edith Anderson, and brother-in-law, Rufus Anderson. He said that while he was patrolling on August 29, 1978, about 2:10 A.M., he saw the defendant, Coon, also Charlie Jenkins, and Ernest Marvin in front of Jenkins' house on Eighth Avenue. Officer *Page 984 
Wood said he had a short conversation with them during which they mentioned that they were about to go to the Zippy Mart for beer.
After the conversation, he continued to patrol, but later was present at the police station when Whatley reported the crime at the Zippy Mart. While investigating the crime, Wood told Lt. Glass of his conversation with the defendant (Coon), Jenkins and Marvin. Thereafter, they drove over to 210 Eighth Avenue and saw Ernest Marvin run out the back door. Wood gave chase, but was unsuccessful and returned to 210 Eighth Avenue where Lt. Glass was waiting. Shortly thereafter, Marvin walked up to the two officers and was taken into custody, and transported to the police station by Officer Knox who had arrived by that time.
Lt. Glass and Officer Wood then were allowed inside Charlie Jenkins' residence by Jenkins. There they took possession of eleven cans of Budweiser beer, took Jenkins into custody, and transported him to the police station. Lt. Glass stated that later that morning he and Lt. Knox saw the defendant, Coon, walking on Eighth Avenue, that they placed him in custody and took him to the police station.
The sister of Charlie Jenkins, Edith Anderson, testified that she and her husband, Rufus Anderson lived with Charlie Jenkins at 210 Eighth Avenue. Mrs. Anderson said that after the police had taken Jenkins into custody, that the defendant came by her house on August 29th and asked for some clothes he said he had left in Jenkins' room. She said he also asked for two magazines that her husband was reading.
After receiving the magazines and the clothes, which were rolled up and wet, Coon left. Mrs. Anderson said that several weeks later she found a wallet in a chest of drawers in Charlie Jenkins' room in her house. She gave the wallet to her husband, Rufus, who took it to the police station.
On cross-examination, she testified that before August 29, 1978, she had never seen the two men's magazines that the appellant took with him. She further stated that the appellant did not live with her or have any control over her home or its contents.
Rufus Anderson's testimony corroborated that of his wife.
William H. Landrum, a forensic serologist for the Department of Forensic Science, testified that he examined a metal milk crate and items of clothing marked as belonging to John Ezra Brown for traces of blood. He said he compared his findings with a sample of blood reportedly taken from the body of the deceased, Brown, and determined that they were of the same blood type "A., n." He stated on cross-examination that to his knowledge none of the items he examined were in any way connected to the appellant.
Howard Easley, Chief Deputy Sheriff, testified that on August 31, 1978, he participated in the search of the alley behind 210 Eighth Avenue, and on August 29, participated in questioning the appellant. He said that, although appellant was never told that he might face the death penalty if convicted, he was told before questioning that he might be charged with a capital crime.
Mrs. Mozelle McCurley was recalled to the stand and testified that the Zippy Mart had the exclusive franchise to sell "High Society" in Andalusia.
Charles Brooks, a laboratory analyst for the Department of Forensic Science at Enterprize, testified that he examined the Zippy Mart in Andalusia on August 29, 1978. He identified a number of photographs of the scene and the same were admitted into evidence without objection. He explained the photographs in relation to a chart of the layout of the Zippy Mart.
On cross-examination, Brooks admitted that when he arrived at the Zippy Mart the building was open and that he did not know if anyone had been in the store prior to his arrival. Defense counsel moved to exclude his testimony, and this was overruled.
Sgt. Marlon Brewer, an investigator for the Alabama Bureau of Investigation, Department of Public Safety, testified that on *Page 985 
the morning of August 30, 1978, the appellant was brought to his office where Howard Easley and Jim Stallings were present, by Lt. Glass, and that appellant signed a waiver of rights form after his rights were read to him.
Over objection, the form was admitted into evidence as State's Exhibit No. 41. Over objection, Brewer testified that appellant admitted being at the Zippy Mart when John Ezra Brown was attacked but, that he denied any overt involvement.
Brewer said that on the afternoon of August 30, 1978, he again questioned appellant. Prior to questions, appellant's rights were read to him and appellant signed another waiver (State's Exhibit 42). Appellant made another oral statement substantially similar to the one he had made that morning and this statement was reduced to writing. Defendant read the statement, initialed each page, and signed it before a notary. The statement was admitted into evidence over objection. (State's Exhibit No. 43).
Sgt. Brewer stated that he again questioned the appellant after lunch on September 5, 1978, after appellant had signed a waiver of Miranda rights form after having same explained to him. At this time, appellant admitted he had taken part of the money stolen from the Zippy Mart and agreed to show the officers where it was hidden. Appellant also showed the officers where he had hidden the knife and where he had burned his own clothing that he had worn on August 29, 1978.
Brewer said that appellant finally admitted killing Brown without provocation because "something just told him to jump on that old man." Brewer then took the inculpatory statement from the appellant which was reduced to writing. The next day, appellant went over the statement line by line, pointed out corrections, initialed each page, and signed it before a notary public. (State's Exhibit No. 46). Brewer said that Howard Easley brought the knife blade which had meanwhile been found. The knife handle and blade were shown to appellant and he said this was the one.
On cross-examination, Sgt. Brewer admitted that a tape had been made of the interview with the appellant on the morning of August 30, 1978, whereupon, defense counsel moved for a mistrial because the tape was not furnished them pursuant to their motion to produce. The motion was denied.
Thereafter, defense counsel and appellant were allowed to hear the tape privately and later the judge heard the tape himself, while having before him the written statement of appellant (State's Exhibit No. 43).
Apparently, State's Exhibit No. 43 was a combined transcription of the interviews with appellant on the morning and afternoon of August 30, 1978. Both interviews were taped.
Defense counsel again moved for a mistrial on the same grounds and his motion was overruled.
On a voir dire examination, outside the jury's presence, to determine the voluntariness of State's Exhibits, Nos. 43 and 46, the appellant testified that he was questioned twice on August 29th, and twice on August 30, 1978, and each time had been read his rights and each time he had signed a waiver of rights form. He testified that he had not been allowed to communicate with his family from August 29th through September 6, 1978, and had not been told of the severity of the punishment he might receive.
Furthermore, he said that he was hypnotized, with his consent, by a Lt. Coffman on August 31, 1978, and that he did not remember what he told him.
The trial court determined that both of the statements were voluntarily made. State's Exhibit No. 43 was read to the jury over objection.
After the jury was recalled, Sgt. Brewer then testified that he again questioned appellant on September 5, 1978, after reading him his Miranda rights, and after appellant signed a waiver form. Over objection, *Page 986 
State's Exhibit No. 45 (appellant's confession) was read into evidence.[2]
On cross-examination, Sgt. Brewer admitted he never told appellant he might face the electric chair if convicted. Furthermore, he admitted that a Lt. Coffman from Florida had hypnotized appellant on August 30, 1978, but that appellant's story did not differ, substantially, from State's Exhibit No. 43.
The tapes of the interviews on the morning and afternoon of August 30, 1978 were played to the jury while each member of the jury also heard, over objections, a tape of the September 5, 1978, interview with appellant in which he admitted killing and robbing the victim.
The appellant did not testify at trial, nor present any evidence in his behalf.
 I
Appellant asserts that the trial court committed reversible error in denying his two motions for a change of venue.
Section 15-2-20, Code of Alabama 1975, provides that a person charged with an indictable offense may have his trial moved to an adjacent county if "he cannot have a fair and impartial trial in the county in which the indictment is found."
In Acoff v. State, 50 Ala. App. 206, 278 So.2d 210 (1973) we find the following discussion:
 "In Mathis v. State, 280 Ala. 16, 189 So.2d 564, we find the following:
 "`Publicity by the press, radio and television does not necessarily constitute ground for a change of venue. See: Denton v. State 263 Ala. 311, 314-315, 82 So.2d 406; Campbell v. State, 257 Ala. 322, 324-325, 58 So.2d 623; Littlefield v. State, 36 Ala. App. 507, 63 So.2d 565, cert. den. 258 Ala. 532, 63 So.2d 573. Whether a motion for a change of venue should be granted is a matter addressed to the sound discretion of the trial court. See: Cobern v. State, 273 Ala. 547, 551, 142 So.2d 869; Collins v. State, 234 Ala. 197, 199, 174 So. 296; Littlefield v. State, supra. From a consideration of the evidence taken on the hearing of the motion, we cannot say that the trial court abused its discretion in denying the motion.'
 "Additionally, the movant has the burden to reasonably satisfy the trial court that an impartial jury cannot be had in the circuit court to which the indictment is returnable. Tiner v. State, 271 Ala. 254, 122 So.2d 738; Dannelly v. State, 47 Ala. App. 363, 254 So.2d 434, cert. den. 287 Ala. 729, 254 So.2d 443."
Judge Bookout, in Gray v. State, 56 Ala. App. 131,319 So.2d 750 (1975), observed the following:
 "The newspaper articles objectively reported the commission of a cold and calloused crime. The articles in the record do not carry inflammatory headlines, nor do they editorialize on the facts in a manner to inflame the community or create an atmosphere of prejudice."
We have examined the newspaper articles attached to appellant's motions and find that the reporting was "factual." We observe no false or prejudicial publicity present in these newspaper articles.
As observed by Mr. Justice Bloodworth in Mathis v. State,292 Ala. 732, 296 So.2d 764 (1974):
 "Therefore, where, as here, there has been no showing of any actual prejudice nor any showing that the pre-trial publicity (although admittedly extensive and widespread) was anything other than `factual,' `truthful,' `objective,' and `reasonably free from any calls for action based upon emotional subjective judgments' (Mathis v. State [1973] 52 Ala. App. 674, 296 So.2d 760, and Mathis v. State [1973] 52 Ala. App. 668, 296 So.2d 755), I am unwilling to presume that the defendant was prejudiced."
Moreover, the trial court requested that questions be submitted to the judge and through him an extensive voir dire examination was allowed of all members of the jury venire. While some of the members of *Page 987 
the venire had seen some of the newspaper stories, nevertheless, each venireman stated that he or she could render a true and impartial verdict based on the evidence presented.
In light of the foregoing, we are of the opinion that the trial court correctly overruled appellant's motions for change of venue.
 II
Appellant's attorneys contend the trial court erroneously refused to grant his two motions for a continuance. Essentially both motions sought more time to prepare for trial.
The two attorneys were appointed to represent appellant on September 12, 1978, the day after the indictment was returned. These attorneys had filed a motion to produce on September 27, 1978, and received the district attorney's reply thereto on October 2, 1978.
The trial court had directed that the attorneys be allowed to hear the taped interviews with appellant and to see any signed statements.
Additionally, a list of State's witnesses was furnished counsel.
Trial of this cause did not commence until October 9, 1978.
We are of the opinion that the trial court did not abuse its discretion in denying appellant's motions for continuance.Rogers v. State, Ala.Cr.App., 365 So.2d 322 (1978); Walker v.State, 265 Ala. 233, 90 So.2d 221 (1956); Seibold v. State,287 Ala. 549, 253 So.2d 302 (1970); O'Neal v. State, 53 Ala. App. 133, 298 So.2d 62, cert. den. 292 Ala. 744, 298 So.2d 70 (1974)
 III
Appellant next asserts error due to the failure of the State to disclose specific items of evidence following his two motions to produce. Specifically, appellant requested all tape recordings of interviews of appellant, and a copy of any written statements. Counsel also requested an opportunity to view all items of physical evidence, which the prosecution intended to introduce at trial.
Pursuant to appellant's motions he was furnished with a cassette recording of the September 5, 1978 interview and a transcript which was a composite of the two interviews conducted on August 30, 1978. Essentially, appellant asserts that his rights under Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated since the State did not furnish him with the actual tapes made on August 30, 1978.
We do not agree with appellant's contention. The composite transcript disclosed all relevant and material matters stated to the officers in the interviews of August 30, 1978, in which the appellant denied being a major participant in the robbery-murder. The interview, wherein he gave his inculpatory statement took place on September 5, 1978, and this was the tape provided to counsel before trial.
Moreover, this court has compared the tapes and the transcript as the same appears in the record and find no material difference. We find no violation of appellant's rights.
 IV
Appellant asserts that under the "totality of the circumstances" of the taking of appellant's confession on September 5, 1978, and its subsequent admission into evidence at trial, shows that such was not voluntarily given.
Essentially, appellant's argument is that he was not informed of the possible consequences due to the severity of the charge against him, and that he was hypnotized by one officer about a week before he gave his inculpatory statement.
In Thomas v. State, Ala., (1979) 373 So.2d 1167, the Alabama Supreme Court determined that law enforcement officers are not required to inform suspects of all possible punishments at the time they begin questioning. *Page 988 
While the record does indicate that appellant was hypnotized several days before he gave his inculpatory statement, there is no indication in the record that this led appellant into making his confession or that such broke down appellant's will, or that he was otherwise induced to confess to the crime.
To the contrary, the record discloses that the appellant was fully advised of his Miranda rights on at least three occasions. On each of these occasions, he signed a written waiver. The record also discloses that there was no abuse, threats made to appellant, no coercion or intimidation in any manner, but rather that appellant understandingly, intelligently and voluntarily gave his statement. Williamson v.State, Ala.Cr.App., 370 So.2d 1054, affirmed 370 So.2d 1066
(1978), and authorities therein cited; Thomas v. State, supra.
 V
Appellant next asserts that the trial court erred in excusing certain prospective jurors outside his presence.
This action of the trial court is now specifically allowed by the provisions of 1971 Ala. Acts, Local Act 200, p. 493. The Supreme Court of Alabama in the case of Bracewell v. State, Ala.S.Ct. Ms. 78-301 (July 6, 1979), specifically approved of the practice here challenged. Thus the trial court's action was correct.
 VI (a)
Appellant asserts the trial court erred in admitting, through the testimony of two experts, Dr. Feibelman and Dr. McCochran, their statements concerning the condition of the victim's body and the wounds thereon. Such contention is without merit, since this testimony was properly admitted. Daniels v. State,50 Ala. App. 88, 277 So.2d 364 (1973); Johnson v. State,21 Ala. App. 565, 110 So. 55 (1926); Dobbins v. State, 274 Ala. 524, 149 So.2d 814 (1963); Luckie v. State, 55 Ala. App. 642,318 So.2d 337, cert. den. 294 Ala. 764, 318 So.2d 341 (1975).
 (b)
Also, counsel challenges the admission of photographs of scene of the crime and of the deceased's body.
Such photographs were properly admitted. Smarr v. State,260 Ala. 30, 68 So.2d 6 (1953); Nichols v. State, 267 Ala. 217,100 So.2d 750 (1958); Brodka v. State, 53 Ala. App. 125,298 So.2d 55 (1974).
 VII
Appellant also asserts that the wallet belonging to the deceased and its contents were improperly admitted. This wallet was found by Mrs. Anderson in the bedroom of Charlie Jenkins, her brother, who lived with her. The appellant (Coon), Jenkins and Marvin were observed outside this house on the night of the robbery-homicide by Officer Wood, about 2:10 A.M. Later the officers recovered eleven cans of Budweiser beer from this residence, which had the Zippy Mart price of $2.09 per six-pack.
Therefore, the admission of the wallet was proper. Grissettv. State, 241 Ala. 343, 2 So.2d 399 (1941); Boulden v. State,278 Ala. 437, 179 So.2d 20 (1965).
 VIII
Appellant's final contentions challenge Alabama's Death Penalty Statute, in that, such violates the Eighth Amendment and the Due Process clause of the Fourteenth Amendment of the United States Constitution.
The Alabama Supreme Court has considered these contentions but found the Alabama statute to meet constitutional standards. Thus, appellant's contentions have been rejected. Jacobs v.State, Ala.Cr.App., 361 So.2d 607, affirmed, Ala.,361 So.2d 640 (1978); Cook v. State, Ala.Cr.App., 369 So.2d 1243 (1977);Williamson v. State, Ala.Cr.App., 370 So.2d 1054, affirmed, Ala.Cr.App., 370 So.2d 1066 (1978); Beck v. State, Ala.Cr.App.,365 So.2d 985 (1978). This record is free of error.
The judgment is therefore affirmed. *Page 989 
AFFIRMED.
All the Judges concur.
[1] See Appendix A, the trial court's order and judgment.
[2] See Vol. 5, R.P. 815-824.
 APPENDIX A
The Court having considered the evidence presented on the trial of this case on October ninth, tenth, eleventh and twelve of this year, and the verdict of the jury returned on October 12, 1978, the evidence presented on hearing on November 15, 1978, and the applicable law of Alabama finds the following aggravating circumstances:
 One. That the Defendant, Huey Edward Coon, did intentionally kill John E. Brown in the perpetration of a robbery or attempt thereof of the said John E. Brown.
 Two. That the Defendant, Huey Edward Coon, committed the capital felony with which he is charged in the commission of a robbery.
 Three. That the Defendant, Huey Edward Coon, committed the capital felony with which he is charged for pecuniary gain.
 Four. That the capital felony was especially heinous, atrocious or cruel in that Huey Edward Coon killed John E. Brown by beating him about the head and face with a wire, metal milk crate resulting in the death of the said John E. Brown.
The Court having considered the mitigating circumstances enumerated in Code of Alabama 1975, Title 13, Section 11-7, and also the record in this cause and any and all other evidence relating to mitigating circumstances whether enumerated or not, specifically finds that no mitigating circumstances exist.
It is therefore ORDERED AND ADJUDGED that the Defendant, Huey Edward Coon, is guilty of the aggravated offense of robbery or attempt thereof in which the victim was intentionally killed by the Defendant.
It is further ORDERED AND ADJUDGED that the aggravating circumstances as set out hereinabove outweigh mitigating circumstances which do not exist. The Court therefore sentences the Defendant, Huey Edward Coon, to death, to be executed on Wednesday, January 17, 1979, by causing to pass through the body of the Defendant, Huey Edward Coon, a current of electricity of sufficient intensity to cause death, and the application and continuance of such current through the body of the Defendant, Huey Edward Coon, until he is dead.
The conviction and sentence being subject to automatic review under Alabama law, the sentence is suspended pending appeal. No bail.
Done and Ordered this twentieth day of November, 1978.
MR. COLQUETT: Judge, the Defendant gives notice of appeal and ask permission to proceed as a pauper.
THE COURT: All right. Let the record so reflect that notice of appeal is again given today, and we will prepare the necessary forms for the Defendant to proceed in pauperis.
You may take charge of the prisoner.
(Whereupon, Court was adjourned at 10:15 a.m.)
This cause coming on to be heard on the motion of the Defendant, Huey Edward Coon, for new trial and the Defendant and his attorneys and the District Attorney being present in open Court submitted the motion as filed to the Court without testimony or argument, and the Court having considered the Motion for New Trial filed in behalf of the Defendant, Huey Edward Coon, is of the opinion that the same is due to be denied. But, the Court is further of the opinion that the Court may have misapplied the law in its consideration of aggravating and mitigating circumstances in that the Court listed in its order of November 20, 1978, aggravating circumstance number three (3), as follows: "That the Defendant, Huey Edward Coon, committed the capital felony with which he is charged for pecuniary gain." The Court further finds, however, that when aggravating circumstance number three (3) is excluded from *Page 990 
consideration, the aggravating circumstances still outweigh mitigating circumstances, it is;
Therefore CONSIDERED, ORDERED AND ADJUDGED that the Motion for New Trial filed in behalf of the Defendant, Huey Edward Coon, be and the same is hereby denied, it is;
Further ORDERED, ADJUDGED AND DECREED that aggravating circumstance number three (3), as set out in this Court's order of November 20, 1978, be and the same is hereby excluded and removed from consideration by the Court. In all other respects, this Court's order of November 20, 1978, shall remain in full force and effect, it is;
Further ORDERED AND ADJUDGED that copies of this Order be furnished to the District Attorney, the Defendant's attorneys of record, and that the Sheriff be and he is hereby directed to serve a copy of this Order on the Defendant, Huey Edward Coon, and make return reflecting said service.
Done and Ordered this the 30th day of January, 1979.